## UNITED STATES *v.* TAYLOR.

1. So much of the act of Congress of Aug. 5, 1861, c. 45 (12 Stat. 282), as provides that the surplus of the proceeds of the sale of real estate sold for a direct tax due to the United States shall, after satisfying the tax, costs, charges, and commissions, be deposited in the treasury, to be there held for the use of the owner of the property, was not repealed by the act of June 7, 1862, c. 98, id. 422.

2. Prior to his application to the Secretary of the Treasury for that surplus, such owner has no claim thereto which can be enforced by suit against the United States.

3. The Statute of Limitations runs from the date of his application.

APPEAL from the Court of Claims.

The facts are stated in the opinion of the court.

*The Solicitor-General* and *Mr. John S. Blair* for the appellant.

*Mr. Albert Pike* and *Mr. Luther H. Pike, contra.*

MR. JUSTICE WOODS delivered the opinion of the court.

This was an action brought against the United States for the recovery of the proceeds of a tax sale of certain land in the State of Arkansas, of which it is alleged that Irene M. Taylor, deceased, the intestate of the appellee, was in her lifetime the owner.

The Court of Claims found as matter of fact that block 37, in Little Rock, Arkansas, was, on May 4, 1865, subject under the provisions of law to a direct tax of $37, which was assessed thereon to Matilda Johnson ; that this tax was so assessed to Matilda Johnson, notwithstanding the fact that on May 4, 1865, Irene M. Jordan was, and ever since March 4,

1863, had been, the owner of said block by purchase from said Matilda Johnson; that, the assessment was made against Mrs. Johnson because she appeared by the records to be the owner of the block, her deed to Mrs. Jordan not having been recorded until Aug. 25, 1866; that the board of direct tax commissioners for the district in which the block was situate sold it, May 4, 1865, to one Meservey, because of the non-payment of said tax, for the consideration of $3,000, of which sum the United States was entitled to $70.50, on account of the tax and the costs and charges and commissions of sale; that in 1865 Mrs. Jordan became the owner of the tax-sale title by purchase for a valuable consideration from Meservey's assignee; that on Dec. 10, 1873, Mrs. Johnson, the former owner, by her formal instrument of writing of that date, recognized Mrs. Jordan, who before that date had intermarried with Charles M. Taylor, as the rightful owner of said block, and of the money in the treasury realized from the tax sale thereof; and that on Jan. 15, 1874, Taylor and wife made application to the Secretary of the Treasury for the residue of the $3,000, the proceeds of said tax sale, after deducting therefrom the tax, penalty, costs, &c. This application was rejected on the 17th of that month.

On Dec. 8, 1875, this suit was brought in the Court of Claims, and on May 19, 1879, judgment recovered for $2,929.50, the amount of said surplus.

The United States has brought the case by appeal to this court for its consideration.

Two questions are raised, the first of which is, whether, under the legislation of Congress, the surplus of the proceeds of lands sold should be returned to the owner.

The act of Aug. 5, 1861, c. 45 (12 Stat. 292), declared that a direct tax of $20,000,000 should be annually laid upon the United States, and the same was apportioned among the several States respectively.

The thirty-sixth section of the act provided for the sale of real estate when personal property could not be found sufficient to satisfy the tax and costs. It concludes as follows: " But in all cases where the property liable to a direct tax under this act may not be divisible, so as to enable the collector by a sale of part thereof to raise the whole amount of the tax, with all

costs, charges, and commissions, the whole of such property shall be sold, and the surplus of the proceeds of the sale, after satisfying the tax, costs, charges, and commissions, shall be paid to the owner of the property, or his legal representatives, or, if he or they cannot be found, or refuse to receive the same, then such surplus shall be deposited in the Treasury of the United States, to be there held for the use of the owner, or his legal representatives, until he or they shall make application therefor to the Secretary of the Treasury, who, upon such application, shall, by warrant on the treasury, cause the same to be paid to the applicant."

It was further provided, that, if no one should bid the amount of the tax and twenty per cent additional thereon, the collector should be required to purchase the land in behalf of the United States, and in that case the owner was allowed to redeem on certain terms within two years.

It is not disputed that under these provisions, if they still remain in force, the appellee would be entitled to the surplus money sought to be recovered in this suit. So that the question presented under this branch of the case is, whether they have been repealed or annulled.

The appellant contends that this has been done by the act of June 7, 1862, c. 98 (12 Stat. 422), "for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes," and later acts.

Neither that nor any subsequent act directly repeals these provisions. If repealed at all, they must, therefore, be by implication. In other words, the subsequent legislation must be so inconsistent with them, that both cannot stand. *McCool* v. *Smith*, 1 Black, 459.

We have been unable to find any such incongruity. The act of 1862 and its amendments make no mention of the right of the owner of the lands to receive the surplus proceeds of their sale. But the absence of such a provision is not sufficient to repeal the positive enactment of 1861. On the contrary, it strengthens the presumption that it was the purpose of Congress to allow that provision to stand.

The act of 1862 provided that, in States where insurrection existed, the entire tax for a State should be apportioned and

levied upon its lands, which should become charged with their respective shares of the tax, which, with a penalty of fifty per cent, should be a lien thereon.

The owner could relieve his lands of the tax by paying it within sixty days after the commissioners had fixed its amount. If he did not pay within that time, the title to the lands became forfeited to the United States; and upon a sale of them, as provided for in the act, it vested in the United States, or the purchaser, in fee-simple, free and discharged of all prior liens, incumbrances, right, title, and claim whatsoever.

The commissioners, in case of the non-payment of the tax, penalty, and charges, were required to sell the lands at public sale to the highest bidder, for a sum not less than the amount of the tax, penalty, &c., and, if no person bid more, then to strike off and sell them to the United States for that sum.

In case the United States became the buyer, there was, of course, no surplus. But if any one purchased for a sum greater than the tax, penalty, &c., the commissioners were to give him a certificate of purchase, which should be evidence of title; and the owner, or any person loyal to the United States having a lien thereon, upon taking an oath to support the Constitution of the United States, was allowed to redeem the lands sold. This court held, in *Bennett* v. *Hunter* (9 Wall. 326), that the primary object of the acts of Aug. 5, 1861, and of June 7, 1862, being the raising of revenue, they must be construed together. In other words, they are to be construed as if passed at the same time, and effect must be given to all the provisions of the first act not in conflict with the later one.

In the same case it was held that the forfeiture declared by the fourth section of the act of 1862 does not operate of its own force to vest the title to the land forfeited in the United States upon the non-payment of the tax, but that a sale as prescribed by the act was necessary to transfer the title.

We find nothing in the provisions of the act of 1862, above recited, which takes from the owner the right accorded him by the act of 1861, of applying for and receiving from the treasury the surplus proceeds of the sale of his lands, nor anything inconsistent with that right.

But it is insisted by the appellant that sect. 12 of the act of

1862 makes a disposition of the surplus proceeds of lands sold for taxes inconsistent with the right thereto claimed by the appellee.

That section declares that " the proceeds of said leases and sales shall be paid into the treasury of the United States, one-fourth of which shall be paid over to the governor of said State wherein said lands are situated, .. . .. when such insurrection shall be put down, . ... for the purpose of reimbursing the loyal citizens of said State, or such other purposes as the State may direct, and one-fourth shall be paid over to said State as a fund to aid in the colonization or emigration from said State of any free person of African descent who may desire to remove therefrom."

On recurring to the preceding sections to ascertain what is meant by the words " said leases and sales," the proceeds of which are to be so disposed of, we find that the first eight sections provide for the assessment of the direct tax upon the lands of the States in insurrection ; for their forfeiture for non-payment of the tax; for their sale at auction ; for their purchase by the United States, if no bid greater than the amount of the taxes, charges, &c., is received ; and for their redemption by the owner.

The act, beginning with sect. 9, then takes up a new subject, which is continued through sects. 10 and 11. They relate exclusively to the disposition to be made of the lands bought by the United States at the tax sales. They authorize the commissioners, under certain circumstances, to lease them, or, under the direction of the President, instead of leasing, to cause them to be subdivided into parcels not to exceed three hundred and twenty acres, and sold. Sect. 12, which provides that the proceeds of " said leases and sales" shall be paid into the treasury, &c., must, we think, be limited to the proceeds of the leases and sales authorized in the three next preceding sections. Such is not only the natural and obvious, but also the grammatical, construction of the act.

That act provided for the collection of direct taxes in insurrectionary districts. It was not a confiscation act. It allowed the owner to redeem his lands within sixty days after the sale of them for taxes, and, while more stringent in its provisions,

was not antagonistic to the previous legislation on the same subject.

Our opinion is, therefore, that the clause of the act of 1861, which allowed the owner of lands sold for taxes to apply for and receive the surplus proceeds remaining after payment of the taxes and charges, is not repealed by the act of 1862.

The second question raised by the appeal is whether the Court of Claims had jurisdiction of a suit for such proceeds, when the application to the Secretary of the Treasury, and the bringing of the suit therefor, were both more than six years after the sale.

Sect. 1069 of the Revised Statutes provides that every claim against the United States cognizable by the Court of Claims shall be for ever barred, unless the petition setting forth a statement thereof is filed in the court within six years after the claim first accrues.

The thirty-sixth section of the act of 1861 required, as we have seen, the surplus proceeds of the sale of land for taxes to be deposited in the treasury, to be there held for the use of the owner or his legal representatives until he or they should make application therefor to the Secretary of the Treasury, who, upon such application, should, by warrant on the treasury, cause the same to be paid to the applicant.

This section limits no time within which application must be made for the proceeds of the sale. The Secretary of the Treasury was not authorized to fix such a limit. It was his duty, whenever the owner of the land or his legal representatives should apply for the money, to draw a warrant therefor without regard to the period which had elapsed since the sale. The fact that six or any other number of years had passed did not authorize him to refuse payment. The person entitled to the money could allow it to remain in the treasury for an indefinite period without losing his right to demand and receive it. It follows that if he was not required to demand it within six years, he was not required to sue for it within that time.

A construction consistent with good faith on the part of the United States should be given to these statutes. It would certainly not be fair dealing for the government to say to the owner that the surplus proceeds should be held in the treasury

for an indefinite period for his use or that of his legal representatives, and then, upon suit brought to recover them, to plead in bar that the demand therefor had not been made within six years.

The general rule is that when a trustee unequivocally repudiates the trust, and claims to hold the estate as his own, and such repudiation and claim are brought to the knowledge of the *cestui que trust* in such manner that he is called upon to assert his rights, the Statute of Limitations will begin to run against him from the time such knowledge is brought home to him, and not before. *Merriam v. Hassam*, 14 Allen (Mass.), 516; *Baker v. Whiting*, 3 Sumn. 486; *Kane v. Bloodgood*, 7 Johns. (N. Y.) Ch. 90; *Attorney-General v. Proprietors of the Meeting-House in Federal Street in Boston*, 3 Gray (Mass.), 1; *Bright v. Segerton*, 2 De G., F. & J. 606; *Wedderburn v. Wedderburn*, 2 Keen, 722.

In analogy to this rule the right of the owner of the land to recover the money which the government held for him as his trustee did not become a claim on which suit could be brought, and such as was cognizable by the Court of Claims, until demand therefor had been made at the treasury. Upon such demand the claim first accrued. As the suit was brought within six years from the date of demand, it falls within the terms of the section giving jurisdiction to the Court of Claims, and is not cut off by the lapse of time.

Our opinion is that the appellee was entitled, under the acts of Congress, to the fund in controversy, and that the petition therefor was filed in the court below within six years after the claim first accrued.

*Judgment affirmed.*