**SISSETON–WAHPETON SIOUX TRIBE, OF the LAKE TRAVERSE INDIAN RESERVATION, NORTH DAKOTA AND SOUTH DAKOTA, Devils Lake Sioux Tribe, of the Devils Lake Sioux Reservation, North Dakota; Sisseton–Wahpeton Sioux Council, of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Donald P. Hodel, Secretary of the Interior; James A. Baker, Secretary of the Treasury, Defendants–Appellees.**

**No. 88–3922.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1989.

Decided Feb. 2, 1990.

Bertram E. Hirsch, Floral Park, N.Y., for plaintiffs-appellants.

M. Alice Thurston, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before BROWNING, SCHROEDER and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

The Sisseton–Wahpeton Sioux Tribe, the Devils Lake Sioux Tribe, and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes ("the Tribes") appeal from the district court's dismissal of their suit, 686 F.Supp. 831, which the court found was barred by the six year statute of limitations imposed by 28 U.S.C. § 2401(a) on all civil actions against the United States. The Tribes brought suit in 1987 to challenge the 1972 law that established the system for distributing a judgment entered by the Indian Claims Commission in 1967. We affirm the district court's dismissal.

FACTS

The underlying facts are not in dispute. In the 1860's, the United States government took 27 million acres of land in Iowa, Minnesota, and South Dakota from the Sisseton–Wahpeton Tribes and subsequently failed to satisfy the terms of the treaties. The Tribes brought claims against the federal government around 1950 under Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70.[1] The Tribes and the government eventually reached a compromise settlement, which was filed with Congress, and thereby became final, in July 1967. *Sisseton and Wahpeton Bands or Tribes v. United States*, 18 Ind.Cl.Comm. 526–1 (1967). Following the usual procedure in these actions, in 1968 Congress appropriated the money to satisfy the settlement and deposited the money in a U.S. Treasury account.

In 1972, Congress enacted a plan for distributing the money. 25 U.S.C. §§ 1300d–3, 1300d–4. This plan apportioned the judgment fund according to "reservation residence and other residence shown on the 1909 McLaughlin annuity roll" and distributed approximately 22% of the fund to the Devils Lake Sioux, 43% to the Sisseton–Wahpeton Sioux, 10% to Assiniboine and Sioux Tribe, and 25% to "[a]ll other Sisseton and Wahpeton Sioux." These latter "lineal descendants" are persons who are not eligible for membership in any of the tribes, but who can trace their lineal ancestry to someone who was a tribal

---

1. Congress created the Indian Claims Commission in 1946 to provide Indian tribes a forum for pursuing a variety of claims against the federal government. The Commission's life was extended until 1978, at which time its unfinished work was transferred to the Court of Claims. The Commission's jurisdiction was restricted to claims brought by tribes, as opposed to individual Indians. The statute allowed tribes to bring any claim that accrued anytime before five years after the ICCA was enacted.

The Commission heard claims and submitted its reports to Congress. When a report determining that a claimant was entitled to recover was filed with Congress, that report had the effect of a final judgment, and authorized the appropriation of money necessary to pay the judgment. The Secretary of Interior then would compose a plan for Congressional approval.

According to F. Cohen's 1982 treatise, *Handbook of Federal Indian Law*, "Congress and the affected tribe have the right to control the disposition and distribution of claim awards. Congress has the power to determine the members of the tribe entitled to receive proportionate shares of tribal lands or funds. This general power also includes the right to establish procedures to determine tribal membership for the distribution of damage claim awards if there is an appropriation satisfying the judgment and if per capita distribution of the judgment is intended by Congress. Although distribution schemes enacted or approved by Congress are subject to judicial review, a distribution plan generally will not be disturbed if it is rationally tied to the government's unique obligation to the tribe." *Id.* 573–574. *See also Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 85, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977).

member. The bill authorized the Tribes to retain 30% of their award to be used for programs to benefit the Tribes' membership, with the remaining 70% to be distributed per capita to tribal members. The Tribes were directed to bring current their membership rolls. The Secretary of Interior was charged with preparing a roll of the lineal descendants of the Sisseton and Wahpeton Mississippi Sioux Tribes, and the money allocated to "all other Sisseton Wahpeton Sioux" was to be paid per capita to those persons appearing on the roll. The roll was completed in April 1987, and payment was scheduled for May 7, 1987.

In April 1987, the Tribes sued to block payment to the lineal descendants and to require the United States to pay their share instead to the Tribes. The Complaint listed eight claims for relief, including various due process violations, unconstitutional taking, breach of contract, and breach of the 1968 Appropriation Act. The District Court for the District of Montana preliminarily enjoined the government from disbursing any funds. The Court noted that the complaint raised serious questions, but criticized as "inexcusable" the Tribes' lack of diligence in bringing the action. In its final order, the Court ruled that all of the Tribes' claims are time-barred by 28 U.S.C. § 2401(a), rejecting their argument that the statute of limitations either is inapplicable or was tolled. The court found that it was irrelevant whether the claims were phrased in terms of a breach of contract, a breach of trust responsibility, or a constitutional violation, since under any theory of a violation of the Tribes' rights, the cause of action stemmed from and accrued at the time the 1972 Distribution Act was passed. The district court made no determination of the merits.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction under 28 U.S.C. § 1291. The district court entered judgment on May 3, 1988, and the notice of appeal was filed on June 20, 1988. The appeal is timely under FRAP 4(a)(1), which provides that where the United States is a party, notice must be filed within 60 days after entry of the judgment.

We review *de novo* a district court's dismissal for lack of subject matter jurisdiction. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989); *Peter Starr Prod. Co. v. Twin Continental Films*, 783 F.2d 1440, 1442 (9th Cir.1986). Whether the district court applied the correct statute of limitations also is a question of law, reviewed *de novo*. *Christensen v. United States*, 755 F.2d 705, 707 (9th Cir.1985). However, where the issue of limitations requires determination of when a claim begins to accrue, the complaint should be dismissed only if the evidence is so clear that there is no genuine factual issue and the determination can be made as a matter of law. *In re Swine Flu Prod. Liab. Litig.*, 764 F.2d 637, 638 (9th Cir.1985); *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 397–98 (9th Cir.1982); *Williams v. Borden, Inc.*, 637 F.2d 731, 738 (10th Cir.1980).

## DISCUSSION

The Tribes' substantive claims appear to have some merit; they assert that at no time prior to or including the entry of the final judgment did the United States represent that nonmembers would have a right to any portion of the judgment funds, and that in approving the settlement, none of the tribes understood that lineal descendants would be sharing in the distribution of the judgment fund. However, the Tribes fail to explain why they waited fifteen years to challenge the government's clear and explicit decision to award part of the fund to nonmembers. Although the Tribes offer many arguments why 28 U.S.C. § 2401(a)'s six year statute of limitations either does not apply or was tolled, they all run up against the same obstacle: the 1972 Distribution Act explicitly made the allocations that the Tribes now allege violated their rights, and the effect and terms of the Act were hardly obscure. In fact, the Tribes participated in the creation of the distribution plan, and eventually endorsed

the Act. Although their support apparently was a compromise in order to get a distribution plan passed and possibly would not foreclose the Tribes from later bringing suit to challenge the Act, the fact of their participation does underscore the point that the Tribes from the very beginning had full knowledge of the Act they now challenge.

## I. *28 U.S.C. § 2401(a) Statute of Limitations.*

The general statute of limitations applicable to civil actions against the United States, 28 U.S.C. § 2401(a), provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The Tribes do not argue that a different statute of limitations applies; they simply challenge the application of § 2401(a).

■ The doctrine of sovereign immunity precludes suit against the United States without the consent of Congress; the terms of its consent define the extent of the court's jurisdiction. The applicable statute of limitations is a term of consent. The plaintiff's failure to sue within the period of limitations is not simply a waivable defense; it deprives the court of jurisdiction to entertain the action. *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841; *Block v. North Dakota,* 461 U.S. 273, 292, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983); *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957).

■ Indian Tribes are not exempt from statutes of limitations governing actions against the United States. *Mottaz,* 476 U.S. at 842, 106 S.Ct. at 2229–30 (Quiet Title Act's statute of limitations applies to Indians as well as to other litigants); *Mann v. United States,* 399 F.2d 672, 673 (9th Cir.1968) (§ 2401(b)'s two year statute of limitations in Federal Tort Claims Act applied to bar Navajo plaintiff's action); *Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002, 1008 (1971) (Tucker Act's six year statute of limitations, 28 U.S.C. § 2501, applies to Indians). Fur-

ther, 28 U.S.C. § 2401(a) applies to equitable claims as well as claims for monetary damages. *Christensen v. United States,* 755 F.2d 705, 708 (9th Cir.1985) (appellants' equitable and legal claims against Bureau of Indian Affairs time-barred by § 2401(a)), *cert. denied,* 476 U.S. 1181, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986).

Because 28 U.S.C. § 2401 is a condition of the waiver of sovereign immunity, courts are reluctant to interpret the statute of limitations in a manner that extends the waiver beyond that which Congress clearly intended. *United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979), *Soriano,* 352 U.S. at 276, 77 S.Ct. at 273; *see, e.g., Block,* 461 U.S. at 287, 103 S.Ct. at 1819–20 (applying statute of limitations contained in Quiet Title Act to bar the state's suit; conditions on the waiver of sovereign immunity "must be strictly observed, and exceptions thereto are not to be lightly implied."). None of appellants' arguments overcome this burden.

## II. *28 U.S.C. § 2401 applies to actions to enforce Indian Claims Commission judgments.*

■ The Tribes begin by claiming that 28 U.S.C. § 2401 does not apply to actions on judgments in general because a court's jurisdiction to enforce a judgment continues until the judgment is satisfied. Appellants rely on *United States v. Taylor,* 104 U.S. 216, 26 L.Ed. 721 (1881), which held that where funds have been deposited to be held for the use of the owner, the statute of limitations runs from the time demand for payment is made at the Treasury. *Id.* at 222. The Tribes are not correct in characterizing their suit as an action to enforce a judgment. If anything, it is an action to challenge a judgment. It is entirely different from *Taylor.* In *Taylor,* the government had sold a property owner's land to collect taxes and placed the surplus proceeds in a Treasury account to be held for the owner until she applied for the money. The claimant demanded the money more than six years after it had been deposited.

The Court understandably held the suit was not barred by the statute of limitations, analogizing from the rule applicable to trusts that the statute of limitations does not begin to run until the trustee "unequivocally repudiates" the trust, which in the context of a trust occurs when the trustee "claims to hold the estate as his own." The court reasoned that a cause of action does not accrue until the beneficiary has knowledge of the repudiation, which in this context would occur only when the trustee refused to pay the money to the beneficiary, which presumably could occur only after the beneficiary has demanded the money. *Id.* The Tribes, in contrast, had immediate knowledge of the precise share of money Congress found them entitled to as well as Congress' intent to distribute the balance to others. Further, *Taylor* and the other "trust repudiation" cases involved uncontested claims, so that it could only be a refusal to pay that could constitute a "repudiation" of the trust.[2] Here, in contrast, the Tribes lost their right to the disputed funds once Congress passed the 1972 Distribution Act. The allocation of funds rather than a demand for payment to the Tribes was the triggering event that commenced the running of the statute of limitations.

Second, the Tribes argue that § 2401(a) is inapplicable to Indian Claims Commission judgments because it is contrary to the intent of the Indian Claims Commission Act. The gist of the argument is that by allowing tribes to bring claims accruing any time up to five years after August 13, 1946, regardless of how early the cause of action accrued, Congress established that it "was not concerned about repose or that Indian claims may be stale." This stretches the Act beyond reason. As the Court interpreted it in *United States v. Dann,* 470 U.S. 39, 45, 105 S.Ct. 1058, 1062,

84 L.Ed.2d 28 (1985), the Act had two purposes. The "chief purpose" of the Act was to "dispose of the Indian claims problem with finality," which was accomplished by giving the Commission's report filed with Congress the effect of a final judgment. The second purpose was to transfer from Congress to the Indian Claims Commission the responsibility for determining the merits of Native American claims. Even if we agree with the Tribes that Congress also intended to open wider the door to federal court especially for Indians to assert claims based on wrongs that occurred when their lands were taken, imposing no time limit on challenges to the distribution plans furthers none of these purposes.

The Tribes rely on *Red Fox v. Red Fox,* 564 F.2d 361 (9th Cir.1977) as support for their claim that § 2401(a) is inapplicable to Indian Claims Commission claims. Although the case is not as irrelevant as the government suggests, we conclude that it lends little comfort to the Tribes. The *Red Fox* court held that the plaintiff's due process claims under the Indian Civil Rights Act were barred by the state court's judgment in a domestic relations case because the state court had fully and fairly litigated the claims. Our court noted, however, that "in view of the unique historical relationship between the American Indian and the federal government, we emphasize that a state court judgment on the merits may not invariably serve as the basis for the application of *res judicata* in a federal suit for alleged violation of the Indian Civil Rights Act." *Id.* at 365. Although we agree with the Tribes that the policy underlying *res judicata* has some congruence with the values promoted by statutes of limitations, we do not agree that this dicta in an Indian civil rights case can be extended to make inapplicable a statute of limitations. *See, e.g., Mottaz,* 476 U.S. at 851, 106 S.Ct. at 2234 ("Federal law rightly provides Indians

**2.** *See also Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002 (1971) (rejecting Indian plaintiff's reliance on *Taylor* to claim exemption from Tucker Act's six year period of limitations because government had been holding money adversely to Plaintiff Capoeman). *Cf. Jones v. United States,* 801 F.2d 1334, 1336 (Fed.Cir.,

1986) (trustee may repudiate trust, so as to start statute of limitations running on claim for breach, either by words or by actions inconsistent with obligations under the trust) *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987).

with a range of special protections. But even for Indian plaintiffs, a waiver of sovereign immunity cannot be lightly implied but must be unequivocally expressed.") quoting *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980).

■ The Tribes also argue that the specific time provisions contained in the Indian Claims Commission Act preempts the general § 2401(a) statute of limitations. We agree that when legislation contains its own statute of limitations, the more specific limitation preempts a more general statute of limitations. *See, e.g., Block,* 461 U.S. at 292, 103 S.Ct. at 1822 (twelve year statute of limitations contained in the Quiet Title Action statute applied to bar the state's claim). Although there is a specific treatment of time limitations on claims filed under the Indian Claims Commission Act—the normal statutes of limitations explicitly were waived, and Tribes were permitted to assert claims within five years of the Act's enactment regardless of when they accrued—that limited waiver defined the scope of claims that could be asserted. The purpose of the Act was to provide final resolution for all tribal claims stemming from the period of United States colonization forward. It cannot be read, as the Tribes suggest, to waive a limitations period for any and all subsequent challenges to settlements or adjudications of those claims simply because "[t]he Act imposed no period of limitation on suits by tribes to enforce their judgments." Brief for Appellants, at 28.

### III.  *Appellants' right of action did not first accrue in 1987.*

■ The Tribes claim that because they did not know the identities of the lineal descendants or their total number until the Secretary of Interior approved the roll in 1987, the Tribes' cause of action did not accrue until that date. "[I]t was only at

that time that the Tribes first learned that the persons identified on the roll were not Sisseton and Wahpeton Sioux lineal descendants." [3] Brief for Appellants, at 30. Although a cause of action does not accrue until the claim is "perfected," and statutes of limitations do not commence running until plaintiffs knew or should have known the facts upon which their claims are based, the mistakes and "new" information the Tribes point to, with one possible exception, simply are irrelevant to their challenge to the 1972 Distribution Act's award of money to lineal descendants.

If the Tribes are claiming that the list erroneously includes *some* individuals who are not lineal descendants, it is difficult to understand how that error could be the basis for challenging the 25% allocation to the lineal descendants as a group. The Tribes cannot claim the entire judgment fund on the basis that errors have been made in identifying some individuals as entitled to share in the 25%. As the government points out, the Tribes' proportion was determined conclusively in 1972; Congress determined at that time that 25% of the fund would *not* go to the Tribes.

The tribes also argue that their claims are based in part on the *number* of persons certified as "lineal descendants," a fact which they could not know until the roll was completed. They complain that the per capita award will be lower for tribal members than for non-members. This indeed may be unfair. However, only if the number of lineal descendants were exceptionally small might the Tribes claim that the distribution plan ultimately is irrational. This does not appear to be the claim they make. We do not, however, rule out the Tribes' amending the complaint to state facts supporting such a claim.

If the Tribes now are claiming that the roll contains *no* lineal descendants, this conceivably could be grounds for reallocating the 25% share to the Tribes, and knowl-

---

**3.** It is unclear from the record whether the Tribes are claiming that the roll contains *no* bona fide Sisseton Wahpeton lineal descendants or that the roll is faulty because *some* nonqual-

ified individuals were included. They appear to be pleading in the alternative, but this strategy has created a muddy and unpersuasive record.

edge of this deficiency would have been necessary to "perfect" the Tribes' cause of action. The basis of the Tribes' claim that none of the individuals on the roll are descendants of Sisseton–Wahpeton tribal members is obscure, however. At oral argument, the Tribes' attorney represented to the court that the Tribal elders possessed knowledge that would substantiate appellants' claim that no lineal descendants appeared on the 1987 roll. As it currently exists, the complaint is not sufficiently informative in regard to this issue to withstand a motion to dismiss. Appellants should be permitted, however, to amend their complaint to assert facts that would form the basis of a claim that *no* lineal descendants appear on the 1987 roll.

In addition, the Tribes argue that the announcement of the composition of the roll in 1987 was critical to their cause of action: only then could the Tribes have known that the list violated the "constitutional eligibility criteria" first articulated in *Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 83, 97 S.Ct. 911, 918, 51 L.Ed.2d 173 (1977). The Tribes misread *Weeks.* Although they are quite right that Congress is not at liberty to disburse Indian Claims Commission judgment funds to anyone it chooses, *Weeks* did not hold that Congress may not disburse funds to individuals who have maintained no affiliation with the Tribe. It simply upheld, as rationally related to fulfilling the "unique obligation toward the Indians," Congress's policy judgment not to do so.[4] *Id.* at 86, 97 S.Ct. at 919–20. Because *Weeks* did not establish a new rule of law affecting the Tribes' ability to bring their cause of action, it cannot, as the Tribes assert, have tolled the statute of limitations.

The Tribes also argue that their cause of action did not accrue until 1987 because

only then did a designated portion of the fund become payable to the individual descendants, who for the first time obtained a vested right in the judgment. Again, this is irrelevant to the Tribes' claim. It might affect the time of accrual of the lineal descendants' cause of action, not the Tribes'. The Tribes also argue that statutes of limitations do not run against erroneous payments until payment is made. However, under *United States v. Dann*, 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) "payment" of Indian Claims Commission judgments occurs when Congress appropriates the money and deposits it into the Treasury. *Id.* at 50, 105 S.Ct. at 1064–65.

### IV. *The statute of limitations has not been tolled.*

The Tribes argue that even if their claim accrued in 1972, the statute of limitations has been tolled because of the various changes in the governing caselaw after 1972, which, according to Appellants, first gave them a "reasonable probability of successfully prosecuting" their claim against the government. *United States v. One 1961 Red Chevrolet Impala*, 457 F.2d 1353, 1358 (5th Cir.1972) (the period of limitations does not always begin on the date of the wrong; no cause of action generally accrues until the plaintiff has a right to enforce his cause). The government responds that the Tribes *had* a reasonable probability of success from the time the cause of action accrued in 1972, and that a statute of limitations "is not tolled by litigative timidity." *Welcker v. United States*, 752 F.2d 1577, 1583 (Fed.Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985). The District Court did not address the Tribes' tolling argument.

The Tribes' first tolling claim is that from 1976 until 1983 the applicable case law led them to believe that the federal government's sovereign immunity was not

---

**4.** The Tribes also point to *Weeks* as providing them with the first notice that all lineal descendants are not necessarily entitled under the Constitution to share in a tribe's Indian Claims Commission judgment fund. This more accurately reports the decision, but this asserted

consequence simply does not square with the Tribes' alternative claim that their equal protection rights were violated because no other tribes had been required to share their judgments with lineal descendants.

waived by the Tucker Act, and, therefore, the Tribes' Tucker Act claims were tolled.[5] This position is unpersuasive since none of the Tribes' claims are Tucker Act claims.

> Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, and the claimant must demonstrate that the source of substantive law he relies upon "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."

*United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (citations omitted). The Tribes' complaint seeks injunctive and declaratory relief; the Tucker Act is limited to claims for money damages and gives no jurisdiction to hear claims for equitable relief.[6] While the Tribes' goal is to secure money for themselves, it is not sought in the form of damages against the government.

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for spe-

cific relief—which may include an order providing for ... "the recovery of specific property *or monies...*."

*Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 2731–32, 101 L.Ed.2d 749 (1988), quoting *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949).[7]

Second, the Tribes assert that they could not have brought their breach of contract claim until 1983, because it was not until the court held in *Angle v. United States,* 709 F.2d 570, 573 (9th Cir.1983) that a settlement embodied in a final decree of the Indian Claims Commission is a contract within the meaning of the Tucker Act that the Tribes knew they had an enforceable contract claim. The government responds that *Angle* merely recharacterized the nature of the cause of action stemming from the injury allegedly suffered, and that this does not mean that the injury was not known or knowable. Perhaps a simpler response is that this portion of the *Angle* opinion merely reiterated that settlement agreements are enforceable under the Tucker Act, citing to *United States v. McInnes,* 556 F.2d 436, 441 (9th Cir.1977).[8]

The Tribes' argument that their violation of due process, the just compensation clause of the fifth amendment, and the 1968 Appropriations Act claims could not

---

5. The Tucker Act generally has been understood as being a grant of jurisdiction and a waiver of sovereign immunity that does not itself create any substantive rights. Plaintiffs suing under the Tucker Act, therefore, must establish that the source of substantive law upon which they rely mandates compensation by the Federal Government for the damage sustained.

  The issue to which the Tribes refer is whether the Tucker Act was itself a waiver of sovereign immunity. The Supreme Court in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), explicitly cleared up any confusion it may have generated in two earlier decisions, *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) and *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); the Court in *Mitchell II,* 463 U.S. at 212, 103 S.Ct. at 2965, stated that the Act constitutes a waiver of sovereign immunity with respect to the claims over which it granted the Court of Claims jurisdiction.

6. *See* P.M. Bator, P.J. Mishkin, D.J. Meltzer, D.L. Shapiro, *Hart and Wechsler's The Federal*

*Courts and the Federal System* 1146 (1988); 17 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure,* § 4101, at 348–355 (1988).

7. *See also* Judge Bork's full discussion on the difference between money damages and other monetary relief reprinted in *Bowen v. Massachusetts,* 487 U.S. 879, ——, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988) ("The term 'money damages' normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" quoting D. Dobbs, *Handbook of the Law of Remedies* 135 (1973)). 709 F.2d at 573.

8. The thrust of the contract analysis in *Angle* was simply that the excluded individual Indian plaintiffs were not parties to the contract because they were not parties to the settlement agreement.

have been asserted until the Supreme Court's decision in *United States v. Dann*, 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) is puzzling. *Dann* held that "payment" of an Indian Claims Commission judgment occurs when Congress appropriates and deposits the money into the Treasury. *Id.* at 50, 84 L.Ed.2d 28. This overturned the Ninth Circuit's ruling that payment does not occur until Congress adopts a plan for distribution. To the extent the law on this issue was unsettled, it could in no way have tolled the statute of limitations, because in this case, the effect of *Dann* was to establish 1968 rather than 1972 as the relevant date.

The Tribes also argue that their claims assert continuing wrongs, and that a claim to redress such violations will be deemed to have accrued on the date of the last wrongful act. While they correctly state the law of continuing violations, *see, e.g., Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir.1984) (tying arrangement could be a continuing violation of Sherman Act, which would toll the statute of limitations), the alleged wrongful acts of the government simply do not constitute a "continuing wrong" for statute of limitations purposes. According to the Tribes, the certification of an improper roll in 1987 was just another in a series of bad acts done by the government against the Tribes. This may be. "Continuing wrongs," however, are repeated instances or continuing acts of the same nature, as for instance, repeated acts of sexual harassment or repeated discriminatory employment practices. In the present case, the alleged wrong is not of such a nature.

Finally, the Tribes argue that the statute of limitations should be tolled to avoid injustice. Although tolling can be based on equitable reasons, precedent is scant and the situations are unlike the Tribes' (*see e.g., Hohri v. United States*, 782 F.2d 227, 247 (D.C.Cir.1986), *rev'd on other grounds* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (government's fraudulent concealment of reports which concluded there was

no military necessity for interning the Japanese tolled the statute of limitations). The United States certainly owes a special obligation, but it is to the Indian *people*. *United States v. Mitchell*, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1982). Here, where the claim essentially pits one group of Indians against another, and the government's actions were clearly visible, there is no basis for such tolling.

## CONCLUSION

We affirm the district court's dismissal of Appellants' suit as barred by the 28 U.S.C. § 2401(a) statute of limitations, subject to the possibility of amending the complaint consistent with this opinion.