# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 95-3795SD

———————

Joyce Loudner; Paul Harrison;   *
Ambrose McBride; Chauncey Long  *
Crow; Della Lytle; Hilda Long   *
Crow; Lisa Redwing; Horace     *
Gilbert Slow; Dorothy Slow;    *
Darlene Fallis Jones; Lyle     *
Medicine Crow; Ramona Estes;   *
Fay Jandreau; and           * On Appeal from the United
Norman V. Taylor,          * States District Court
                       * for the District of
       Appellants,     * South Dakota.
                       *
   v.                *
                       *
                       *
United States of America and   *
Bruce Babbitt,          *
                       *
       Appellees.     *

———————

Submitted: October 23, 1996

Filed: March 13, 1997

———————

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON and MORRIS
SHEPPARD ARNOLD, Circuit Judges.

———————

RICHARD S. ARNOLD, Chief Judge.

Plaintiffs seek to claim their share of a judgment fund created by Congress to satisfy the federal government's obligations to the descendants of the Sisseton-Wahpeton Sioux Tribe. The

District Court held that their claims are barred by the six-year statute of limitations in 28 U.S.C. § 2401(a) and dismissed their

complaint for want of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Because the plaintiff's claims did not accrue until they had reason to know of the existence of the judgment fund and how it would be distributed, we hold that their claims are not time-barred, reverse the decision of the District Court, and remand for further proceedings.

I.

In the mid-nineteenth century the United States took almost 30 million acres of land from the Sisseton-Wahpeton Sioux Tribe pursuant to treaties, the terms of which the government never satisfied.  During the Civil War, the military put down a Sioux uprising in Minnesota and forced the dispersal of the Sioux bands, a majority of whom formed three successor tribes.  A large number of the dispersed Sioux affiliated with other tribes.  More than a century later, the government settled a class action brought by the three successor tribes of the Sisseton-Wahpetons.  In 1968, Congress appropriated money to satisfy the judgment, and then, in 1972, enacted a plan to distribute what was then a $6,000,000 judgment fund.

It is important to have in mind the precise terms of the statute that provides for the distribution of this fund.  We therefore set out the statute in full at this point.  The relevant provisions are §§ 201, 202, and 305 of the Act of October 25, 1972, Pub. L. No. 92-555, 86 Stat. 1169, 1170.  These provisions are now codified as 25 U.S.C. §§ 1300d-3, 1300d-4, and 1300d-9.  They read as follows:

> § 1300d-3.  Upper Council Sioux; membership rolls; applications for enrollment; finality of determinations

-3-

(a) The Devils Lake Sioux Tribe of North Dakota, and the Sisseton and Wahpeton Sioux Tribe of South Dakota, shall bring current their membership rolls of

October 25, 1972. The Assiniboine and Sioux Tribes of the Fort Peck Reservation, Montana, shall prepare rolls of their members who are lineal descendants of the Sisseton and Wahpeton Mississippi Sioux Tribe, who were born on or prior to and are living on October 25, 1972, and who are entitled to enrollment on their respective membership rolls in accordance with the applicable rules and regulations of the tribe or group involved, using available records and rolls at the local agency and area offices, and any other available records and rolls. Applications for enrollment must be filed with each group named in this section and such rolls shall be subject to approval of the Secretary of the Interior. The Secretary's determination on all applications for enrollment shall be final.

(b) The Secretary of the Interior shall prepare a roll of the lineal descendants of the Sisseton and Wahpeton Mississippi Sioux Tribe who were born on or prior to and are living on October 25, 1972, whose names or the name of a lineal ancestor appears on any available records and rolls acceptable to the Secretary, and who are not members of any of the organized groups listed in subsection (a) of this section. Applications for enrollment must be filed with the Area Director, Bureau of Indian Affairs, Aberdeen, South Dakota. The Secretary's determination on all applications for enrollment shall be final.

§ 1300d-4. Apportionment of funds

(a) Basis of apportionment

After deducting the amount authorized in section 1300d of this title, the funds derived from the judgment awarded in Indian Claims Commission docket numbered 142 and the one-half remaining from the amount awarded in docket numbered 359, plus accrued interest, shall be apportioned on the basis of reservation residence and other residence shown on the 1909 McLaughlin annuity roll, as follows:

| Tribe or group | Percentage |
|---|---|
| Devils Lake Sioux of North Dakota | 21.6892 |
| Sisseton-Wahpeton Sioux of South Dakota | 42.9730 |
| Assiniboine and Sioux Tribe of the Fort Peck Reservation, Montana | 10.3153 |

All other Sisseton and Wahpeton Sioux --------- 25.0225

         *    *    *    *    *    *    *    *

         (c)  Per capita distribution to enrollees

         The  fund  allocated  to  all  other  Sisseton  and
    Wahpeton Sioux, . . . shall be distributed per capita to
    the  persons  enrolled  on  the  roll  prepared  by  the
    Secretary pursuant to section 1300d-3(b) of this title.

    § 1300d-9.  Rules and regulations

         The  Secretary  of  the  Interior  is  authorized  to
    prescribe  rules  and  regulations  to  carry  out  the
    provisions   of   this   subchapter,   including   the
    establishment of deadlines.


    Certain aspects of this plan of distribution need to be kept
in mind.  The fund was to be divided into four parts, three of
which were to go to three named organized tribes, or their members:
the Devils Lake Sioux Tribe of North Dakota, the Sisseton and
Wahpeton Sioux Tribe of South Dakota, and the Assiniboine and Sioux
Tribes of the Fort Peck Reservation, Montana.  Each of these three
tribes was given the responsibility to prepare membership rolls.
The remainder of the fund, some 25.0225 per cent., was to go to
"the lineal descendants of the Sisseton and Wahpeton Mississippi
Sioux Tribe who were born on or prior to and are living on
October 25, 1972, whose names or the name of a lineal ancestor
appears on any available record and rolls acceptable to the
Secretary, and who are not members of any of the organized groups
listed," § 1300d-3(b), as receiving the first three shares.  The
plaintiffs in this case claim that they are members of this last
group, and that they have received nothing.  In the case of this
last group, the responsibility of preparing a roll of eligible
persons is placed on the Secretary of the Interior, not on any
tribe.  The statute further provides, however, that applications
for enrollment must be filed with the area director of the Bureau

of Indian Affairs in Aberdeen, South Dakota, and that the Secretary is authorized to prescribe rules and regulations to carry out the

statute, "including the establishment of deadlines."  Section 1300d-9.

The Secretary in fact did issue regulations on May 25, 1973. 38 Fed. Reg. 13737, codified at 25 C.F.R. § 41.1 (1973), and now recodified at 25 C.F.R. § 61.4(s)(1995).  The regulations established a deadline of November 1, 1973, a period of about five months, for persons claiming to be eligible lineal descendants to file their applications.

The plaintiffs in this case did not file an application by the deadline fixed in the regulation.  The Secretary took various steps to notify possibly interested persons.  These steps will be detailed later in this opinion.

Many of the plaintiffs in this case live on the Crow Creek Indian Reservation at Fort Thompson, South Dakota.  They claim to be lineal descendants of the Sisseton-Wahpeton Sioux Tribe, but say that they knew nothing about the fund until late 1994, when a representative of the Bureau of Indian Affairs told them about it at a meeting on the Crow Creek Reservation.  (There may be other persons similarly situated.  The named plaintiffs brought this suit on behalf of themselves and others similarly situated.)  Whether the plaintiffs actually are eligible lineal descendants, and whether any of them, individually, had actual knowledge of the fund earlier than they claim, are questions of fact yet to be determined.  The government's defense of limitations is based upon its general assertion that it long ago took reasonable steps to notify interested persons that they needed to file an application and, in fact, a number of people have so filed.  The Secretary has found, prior to the filing of this case, that each of 1,969 lineal descendants is eligible to receive a $746.00 share of the fund.

See <u>Sisseton-Wahpeton Sioux Tribe v. United States</u>, 90 F.3d 351, 355 (9th Cir.) (per curiam), <u>cert.</u> <u>denied</u>, 117 S. Ct. 516 (1996)

(unsuccessful attempt of the three named tribes to invalidate altogether the share of the non-member lineal descendants).

After learning of the fund's existence at the meeting we have described, the plaintiffs brought this case. They claim that the procedures used by the Secretary to notify eligible descendants were legally deficient and amounted to a breach of the government's fiduciary duty as trustee. The basis of our jurisdiction is the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2), under which the United States has waived sovereign immunity with respect to civil actions founded upon any Act of Congress or any regulation of an executive department. The jurisdiction of the district courts (as distinguished from the United States Court of Federal Claims) under this statute is limited to claims not exceeding $10,000.00, and each of the plaintiffs alleges that his or her individual claim is less than this amount.

The parties agree that the applicable statute of limitations is 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The crucial question, then, is when the plaintiffs' claim first accrued. The parties agree that "accrual," for this purpose, occurs when the plaintiffs either knew, or in the exercise of reasonable diligence should have known, that they had a claim. The District Court found that the claim accrued in 1972, when Congress enacted its plan for distributing the settlement funds. It therefore held the action barred by limitations and dismissed for lack of subject-matter jurisdiction. (Filing within the applicable statute of limitations is treated as a condition precedent to the government's waiver of sovereign immunity, and cases in which the government has not waived its immunity are

-11-

outside the subject-matter jurisdiction of the district courts.)[1] The Court further found, as an aspect of its accrual analysis, that the steps taken by the government to notify the plaintiff were constitutionally adequate and not otherwise legally deficient. This appeal followed.

## II.

"[T]here is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust."  Rogers v. United States, 697 F.2d 886, 890 (9th Cir. 1983); see also United States v. Mitchell, 463 U.S. 206, 225 (1983).  This obligation derives from "a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of [the Supreme] Court" under which the Government "has charged itself with moral obligations of the highest responsibility and trust" in carrying out its treaty obligations with the Indian tribes.  Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942)(footnote omitted).   This "trust relationship extends not only to Indian Tribes as governmental units, but to tribal members living collectively or individually, on or off the reservation." Little Earth of United

---

[1]Judge Fletcher has elegantly summarized these jurisdictional rules in Sisseton-Wahpeton Sioux Tribe v. United States, 895 F.2d 588, 592 (9th Cir.), cert. denied, 498 U.S. 824 (1990):

> The doctrine of sovereign immunity precludes suit against the United States without the consent of Congress; the terms of its consent define the extent of the court's jurisdiction.  The applicable statute of limitations is a term of consent.  The plaintiff's failure to sue within the period of limitations is not simply a waivable defense; it deprives the court of jurisdiction to entertain the action.

Tribes, Inc. v. HUD, 675 F. Supp. 497, 535 (D. Minn. 1987), amended, 691 F. Supp. 1215 (D. Minn. 1988), aff'd, 878 F.2d 236

(8th Cir. 1989), cert. denied, 494 U.S. 1078 (1990).  In this case, the government points to no statutory language relieving it of these long-established obligations with respect to the lineal descendants of the Sisseton-Wahpeton Sioux.  Accordingly, the government had the obligation to act as a trustee in its management of the judgment fund, and we must judge its conduct "by the most exacting fiduciary standards."  Seminole Nation, 316 U.S. at 297.

The fact that plaintiffs are beneficiaries of a trust does not mean that they are exempt from the running of the statute of limitations.  See Menominee Tribe of Indians v. United States, 726 F.2d 718 (Fed. Cir.), cert. denied, 469 U.S. 826 (1984).  The statute of limitations begins to run when a trust beneficiary knows or should know of the beneficiary's claim against the trustee. Nonetheless, because the beneficiary is entitled to rely upon the good faith and expertise of the trustee, the beneficiary's duty to discover claims against the trustee is somewhat lessened. Manchester Band of Pomo Indians v. United States, 363 F. Supp. 1238 (N.D. Cal. 1973).  See Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 9 (5th Cir. 1967) (footnote omitted) ("The presence of a fiduciary relationship . . . bears heavily on the issue of due diligence."). The beneficiary's duty to discover his or her claims against the trust is further diminished when the beneficiary has no idea that the trust even exists.  One of the fundamental obligations of a trustee is the identification and notification of trust beneficiaries.  See G. G. Bogert and G. T. Bogert, The Law of Trusts and Trustees § 961, at 3 (rev. 2d ed. 1984)("[T]he trustee is under a duty to notify the beneficiary of the existence of the trust . . . ").  See also Rogers v. United States, 697 F.2d 886, 890 (9th Cir. 1983).  A beneficiary may reasonably expect that the trustee will let the beneficiary know that he or she is a beneficiary.   When the beneficiary hears nothing about the trust

from the trustee (or any other source), the beneficiary cannot be expected to pursue a claim to the trust in a timely fashion. In this case, the plaintiffs were wholly unaware that the trust

existed.  Moreover, they were not in possession of facts that would naturally have led them to inquire about the existence of the judgment fund, since neither they nor their tribal leaders were participants in the original lawsuit.  Because plaintiffs had no reason to know of the existence of the judgment fund and, consequently, of their possible claim to it, they have a strong argument that the statute of limitations did not begin to run on their claim until they received actual notice of the fund's existence in 1994.[2]

Though plaintiffs had no knowledge that should have prompted them to pursue their claims against the fund, their claims still might be time-barred if the government adequately performed its duties as trustee.  The government made some efforts to notify beneficiaries of the fund of its existence.  In addition to publishing the regulations governing the fund's distribution in the

---

[2]The way that courts have historically applied the statute of limitations to claims challenging so-called trust repudiations provides support for our approach.  Where the trustee repudiates the trust by claiming to hold the trust corpus as the trustee's own, the cause of action does not accrue until the beneficiary "has knowledge of the repudiation."  Sisseton-Wahpeton Sioux Tribe v. United States, 895 F.2d 588, 593 (9th Cir.), cert. denied, 498 U.S. 824 (1990).

There is authority that where the trustee repudiates the trust, the statute of limitations will apply "from the date when the beneficiary . . . by the exercise of reasonable skill and diligence could have learned of [the repudiation]."  See Bogert, supra, § 951, at 630-34.  In all of the cases cited in support of that proposition, however, the plaintiff/beneficiary was in possession of some facts that would have put a reasonable person on notice of the repudiation of the trust, and in none of them was the beneficiary justifiably ignorant of the existence of the trust itself, as is the case here.  Cf. Manchester Band of Pomo Indians v. United States, 363 F. Supp. 1238 (N.D. Cal. 1973) (since government did not pay out income regularly to Band, a lack of payments or information did not put Band on notice that government was mismanaging funds).

Federal Register, the government sent notification packets and news releases to various Indian organizations and newspapers around the

country.  It also sent notice to the twelve area Bureau of Indian Affairs offices as well as the agencies that serve the specific tribes and asked the superintendents of those agencies to post the notice.  The government was able to locate one press release dated two weeks before the application deadline. The government and plaintiffs also unearthed three articles from newspapers distributed in South Dakota about the fund, though the articles in two of the newspapers appeared less than a week before the application deadline.

While attempting to notify the beneficiaries of the existence of the trust and how they could claim their share of it, the government was in possession of a 1909 annuity pay-roll listing the names of over 1900 Sisseton-Wahpeton Sioux.  It is this list that the government is now using to determine the eligibility of applicants for a share of the judgment fund.  Almost 300 of the names on the list (14 per cent. of the total) were from the Crow Creek or Lower Brule areas of South Dakota, the areas of South Dakota where most of the plaintiffs live.[3]  As the plaintiffs argue, "It would have been simple to . . . provide concentrated notification procedures in those areas where the ancestors were known to have resided. . . ." Appellants' Reply Br. 15.  Given the high concentration of Sisseton-Wahpeton Sioux ancestors who lived in the Crow Creek area of South Dakota in 1909, the government, acting in its role as trustee, should at least have held a meeting on the Crow Creek reservation to inform potential beneficiaries of the fund's existence and to explain the application procedure to them.  The government never held such a meeting for any of the descendants of the Sisseton-Wahpeton Sioux.  We cannot say that the

_____

[3]All of the plaintiffs are members of the Crow Creek Sioux Tribe.  See Appellants' Br. 8.

plaintiffs should have known of their interest in the fund because a notice was at some point tacked to a bulletin board in the local

reservation office.[4]  We think that notice by publication is insufficient to begin the running of the statute of limitations against a beneficiary who is unaware of the trust's existence, unless there is no reasonable alternative.[5]  Because the steps that the government actually took were insufficient to put a reasonably diligent beneficiary on notice of the trust's existence, the plaintiffs' claims are not time-barred.[6]

III.

The fact that plaintiffs' claims are not time-barred does not automatically entitle them to their share of the fund.  They still must contend with the fact that the Secretary of the Interior established an application deadline that plaintiffs failed to meet. We note at the outset that it would seem somewhat anomalous to excuse plaintiffs from the six-year statute of limitations but allow the Secretary to bar their claims with a deadline that gave beneficiaries approximately five months to apply for their share of the fund.  We hold that by providing an unreasonably short time

---

[4]We also note that even if the statute of limitations bars some plaintiffs' claims, there may be beneficiaries in the group who were young children or incompetent at the time of the original application deadline.  If so, the statute of limitations would not bar their claims until three years after their disabilities were lifted.  28 U.S.C. § 2401(a).

[5]For this reason and the reasons given by the District Court, we also reject the government's argument that under 44 U.S.C. § 1507 notice by publication in the Federal Register was sufficient to notify beneficiaries of their share of the Fund.

[6]Because we hold that the government failed to live up to its trust obligations, we do not address the plaintiffs' argument that the government's notice procedures did not satisfy constitutional standards.  We are inclined to agree with the District Court on this point.  But efforts that satisfy constitutional standards may nonetheless violate the government's fiduciary obligations.  A trustee must do more than simply comply with the Constitution.

period to allow beneficiaries to apply for their share of the fund and failing to provide beneficiaries with adequate notice, the

Secretary acted contrary to his common-law obligations as trustee. Accordingly, the Secretary's deadline is invalid, and plaintiffs should have the right to apply for their share of the fund.

As we discussed above, the Secretary's minimal efforts to notify beneficiaries of the existence of the trust corpus demonstrate that he was not fulfilling his trust obligations when he formulated the distribution plan.[7] No meetings were held on tribal reservations even though the new tribal identities of the beneficiaries' Sisseton-Wahpeton ancestors were a matter of historical record. Even if the Secretary did not have a duty to discover the identity of every lineal descendant and notify him or her personally, he should have used the best means of notice reasonably practicable to try to notify as many beneficiaries as possible.

The Secretary makes much of the fact that there were 11,000 timely applications, 190 of which were from the Fort Thompson area of South Dakota, where many of the named plaintiffs now live. The fact that many managed to find out about the fund, however, is irrelevant if many whom the Secretary could easily have notified did not. The record contains the testimony of several plaintiffs and the affidavit of another that they were living in the Crow Creek/Lower Brule area in 1972 and had no notice of their eligibility for a share of the fund. Seventy-four other people signed a list saying that they believed themselves to be lineal descendants of Sisseton-Wahpeton tribal members but received no

_____

[7]We agree with the plaintiffs that the government may not avoid its trust duties on the grounds that the budget and staff of the Department of Interior are inadequate. This circumstance may well excuse any delay on the part of individual employees of the Bureau of Indian Affairs. But the United States may not evade the law simply by failing to appropriate enough money to comply with it.

notice of the availability of the fund until 1994.  One witness estimated that there were at least 500 descendants who would not

receive their share of the fund under the Secretary's distribution scheme.

The Secretary purported to require that beneficiaries of the fund send in their applications within five months of the promulgation of the regulations establishing the deadline. This deadline was unreasonably short, especially given the fact that the lineal descendants of the Sisseton-Wahpetons who were not members of the three successor tribes did not participate in the lawsuit that led to the creation of the settlement fund and thus had no special reason to follow the proceeding. They also did not have tribal leaders who had reason to follow the proceeding and who could therefore notify them of its outcome. Moreover, the Secretary could not plausibly argue that this deadline was necessary (or even reasonably calculated) to distribute the fund quickly because to this day, more than 23 years later, the fund remains undistributed.[8]

---

[8]The Secretary may blame part of the delay (about ten years) on the lawsuit filed by the successor tribes, as well as the current lawsuit. According to the government, part of the time was spent finishing the processing of applications for a different judgment fund before the government could turn to the Sisseton-Wahpeton fund. A BIA official who worked on distributing the Sisseton-Wahpeton settlement indicated that the other judgment fund delayed distribution by as much as five years. There was no reason for the Secretary to establish a deadline before the government even had people who had time to process the fund's applications.

It is not a legitimate response, given the government's trust obligations, to say that the purpose of the deadline was to reduce the number of applicants to a manageable level. As trustee, the government has no interest in keeping people from applying for their share of the fund. The only legitimate purpose of a deadline in this context is to prevent applications from continuing to trickle in after the Secretary is ready to distribute the fund. Since the deadline set by the Secretary bore absolutely no relationship to a realistic date of distribution, it was arbitrary.

-24-

Accordingly, we hold that the distribution scheme adopted by the Secretary was contrary to his common-law trust obligations and that the deadline cannot serve to bar plaintiffs' claims to the fund.

## IV.

We reverse the District Court's determination that plaintiffs' claims are barred by limitations, and also hold that the Secretary may not use the 1973 deadline to bar the plaintiffs' claims. We remand to the District Court for proceedings consistent with this opinion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.