**Marx E. ANGLE, et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 82–4268.**

United States Court of Appeals,
Ninth Circuit.

June 29, 1983.

Martin Green, Dept. of Justice, Washington, D.C., for defendant-appellant.

Forest E. Wright, California Indian Legal Services, Escondido, Cal., for plaintiffs-appellees.

Before DUNIWAY, GOODWIN, and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

This is an interlocutory appeal presenting jurisdictional and liability issues in an action seeking shares of a $29.1 million judgment arising out of a settlement of land claims of certain groups of California Indians. We find jurisdiction, although on a different ground from that adopted by the trial court, but we reverse the court's finding of liability.

## I. *Facts.*

Appellees are Native American Indians who allege that they have been denied their rightful shares of a $29.1 million settlement of land claims against the United States, the appellant. The settlement was between the United States and certain groups of California Indians who asserted that their land had been taken from them illegally, and was entered in 1964 by the Indian Claims Commission as a "final Determination or Judgment," *Thompson v. United States,* 1964, 13 Ind.Cl.Comm. 369. Congress appropriated funds for the judgment in 1964, Pub.L. 88–635, ch. XI, 78 Stat. 1023, 1033, but did not specify procedures for paying out the money. For that purpose, a Distribution Act was enacted on September 21, 1968, 25 U.S.C. §§ 659–663, Pub.L. 90–507, 82 Stat. 860. The 1968 Act authorized the Secretary of the Interior to promulgate regulations, including "an appropriate deadline" for claimants to apply, 25 U.S.C. § 663, and directed the Secretary to prepare a roll of eligible Indians from those applying and distribute to each an equal share of the total. §§ 659, 660.

The Indians' substantive allegations concern the Secretary's deadlines for applications. He imposed an original deadline of September 22, 1969, by regulation, 25 C.F.R. § 43e.5 (1969), 33 Fed.Reg. 16,086 (1968). It is undisputed that, before the deadline, the government vigorously sought to notify

potential claimants that they could apply. The government stopped its publicity campaign on September 22, 1969, but approximately a year later, in September and October of 1970, the Commissioner of Indian Affairs sent memoranda to Bureau of Indian Affairs area directors directing them to continue accepting applications. No public notice of the memoranda or their contents was given officially, although at least some informal information was apparently provided on an ad hoc basis. On February 5, 1971, the Commissioner revoked his earlier memoranda in a further memorandum, not publicly available. No applications filed after February 5, 1971 were accepted. On December 18, 1972, the fund was distributed, in equal amounts of $668.50, to eligible Indians, including those who had applied after September 22, 1969 but on or before February 5, 1971.

One group of appellees claims to represent the class of Indians who applied for the money between February 5, 1971, and the date of distribution. Another appellee claims to represent the class of Indians who applied after the date of distribution. The Indians sued in district court, seeking damages and injunctive relief.

The district court ruled that jurisdiction of the monetary claims against the United States was proper under the Tucker Act, 28 U.S.C. § 1346(a)(2), because the settlement was a contract under which the United States assumed certain obligations toward the Indians. He dismissed all other defendants and rejected the Indians' arguments (1) that jurisdiction of the damages claims against the government existed also under the Tucker Act by virtue of the 1968 Distribution Act or by virtue of the Constitution, and (2) that 28 U.S.C. § 1331, by virtue of the Administrative Procedure Act, 5 U.S.C. § 702, provided jurisdiction of the claims for injunctive relief. The court granted partial summary judgment for the Indians on their contract allegations against the government. Calculation of damages was postponed until determination of class certification. We granted permission to appeal the issues of jurisdiction and liability under 28 U.S.C. § 1292(b).

## II. *Jurisdiction.*

### A. *Our Jurisdiction.*

Because this is an interlocutory appeal under 28 U.S.C. § 1292(b), our jurisdiction is limited to those matters certified to us under that section. The questions stated in the judge's order and certification are:

(a) "whether the court has jurisdiction of this matter under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491, on either a breach of trust or a breach of contract theory" and

(b) "whether the United States breached the settlement contract, thus entitling ... plaintiffs to money damages." (Record, item 87, p. 22.)

In our order granting permission to appeal, we stated that "the appeal shall include all issues as to subject matter jurisdiction in the district court, cf. *Chouinard v. Chouinard,* 568 F.2d 430, 433 (5th Cir.1978), as well as the numerous contentions as to liability for breach of contract."

The district judge decided that he did not have Tucker Act jurisdiction on a breach of trust theory. (Record, item 58, pp. 16–29.) The plaintiffs have not sought leave to appeal from that decision. However, as we have seen, the judge did include it in his certification, and plaintiffs did reargue the issue on appeal.

In *Chouinard, supra,* the Fifth Circuit said this:

At the outset, we note that defendants-appellees did not bring a cross-appeal but rather asserted a "no duress" argument in their brief. It is true, of course, that an appellee who wishes to secure alteration or modification of a judgment must cross appeal. *See Colvin v. Dempsey-Tegeler & Co.,* 477 F.2d 1283, 1293 (5 Cir. 1973); *Helvering v. Pfeiffer,* 302 U.S. 247, 58 S.Ct. 159, 82 L.Ed. 231 (1937). However, it is axiomatic that only a party aggrieved by a final judgment may appeal. If the appellee is fully satisfied with the judgment actually rendered, he need not cross appeal, even though he wishes to argue on appeal, in support of the judgment, that the district court

erred regarding particular rulings or the reasons for the judgment. *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560 [563], 68 L.Ed. 1087 (1924); *Spurlin v. General Motors Corp.,* 531 F.2d 279, 280 (5 Cir., 1976). That is the situation here, for defendants are urging an alternative theory in support of a judgment favorable to them.

568 F.2d at 433.

■ We have often asserted that we can affirm a ruling on any ground supported by the record, even if that ground is not asserted by the appellee, e.g., *Davis v. United States,* 9 Cir., 1979, 589 F.2d 446, 448, n. 3; *see Jaffke v. Dunham,* 1957, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314. Thus we conclude that we can consider the breach of trust theory as a ground for upholding jurisdiction under the Tucker Act, even though the appeal here is interlocutory, rather than from a final judgment, as in *Chouinard.* We can think of no good reason why the rule should not apply when we consider a question that is properly before us under 28 U.S.C. § 1292(b). *See, also, Myers v. American Dental Association,* 3 Cir., 1982, 695 F.2d 716, 725 & n. 14. *Myers* was a § 1292(b) appeal in which the winning party on the issue below had not "focused" on appeal on the alternate ground favored by the court of appeals.

B. *Jurisdiction of the District Court.*

We agree with the district court that the Tucker Act gave it jurisdiction of the Indians' claims for damages against the United States, but for a different reason from that relied on by the district court.

1. *Breach of Contract.*

■ The trial court held, first, that the Tucker Act itself provides both jurisdiction and a waiver of sovereign immunity in a civil action upon "any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). We agree. *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co. of California, Inc.,* 9 Cir., 1979, 595 F.2d 1126, 1130–1132; *DSI Corp. v. Secretary of Housing and Urban Devel-*

*opment,* 9 Cir., 1979, 594 F.2d 177, 180; and *see United States v. Sherwood,* 1941, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058. The trial court then held that the Settlement Agreement, which is embodied in the decree of the Claims Commission, is a "contract" within the meaning of the Tucker Act. Again, we agree. *United States v. McInnes,* 9 Cir., 1977, 556 F.2d 436, 441.

■ Finally, the court held that it had jurisdiction under the Tucker Act because the plaintiffs (and presumably the classes they represent), are parties to the "contract." Here, we part company with the trial court. That is because the plaintiffs are not parties to the settlement agreement and judgment. They are explicitly excluded from being parties by the language of the settlement agreement. It provides for "a single judgment in the sum of $29,100,-000 against the United States . . . in favor of all of the petitioners (as representatives of the tribes, bands or groups of Indians on whose behalf said petitions are presented), as a single class; *it being understood and agreed that the judgment shall not vest in individual members of said single class"* (emphasis added), 13 Ind.Cl.Comm. 369 at 389. Those being the terms of the settlement, we cannot agree that the settlement or the judgment was a "contract" to which individual Indians, such as the plaintiffs, were parties, or of which they were third party beneficiaries. The terms of the settlement preclude such a holding. *See Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539.

In its decision, *Thompson, et al. v. United States,* 1964, 13 Ind.Cl.Comm. 369, at 542, the Commission said:

[T]he Commission does not have any authority to direct or make distribution of awards granted because that is strictly the function of Congress and consequently we cannot direct in our judgments the distribution of money to individual Indians but only to Indian entities such as tribes, bands, or identifiable groups of Indians as we have done in this case.

Nor did the 1964 Appropriation Act, Pub.L. 88–635, ch. XI, *supra,* make individual Indians parties to, or beneficiaries of, the settlement agreement or judgment. That act simply appropriated money to pay the judgment. As we have seen, it was "the tribes, bands or groups of Indians . . . on whose behalf" the petitions were presented and the judgment was entered, and expressly not the individual members of those tribes, bands, or groups of Indians.

It was the 1968 Distribution Act, *supra,* which first provided, in § 2, 25 U.S.C. § 660(a), for payments to individual Indians. When the 1968 Act was enacted, on September 21, 1968, the funds appropriated in 1964 became, for the first time, a fund held for the benefit of, and payable to, individual members of the "tribes, bands or groups." That, however, did not make the Indians party to the "contract." It changed the contract, and provided, contrary to the contract, for payment of the appropriated funds to individual Indians. This may have been what the "tribes, bands, or groups" were hoping all along that they would accomplish, but it was not the settlement agreement and judgment that did it; it was the 1968 Distribution Act.

We conclude that the court did not have jurisdiction under the "express or implied contract" language of the Tucker Act.

### 2. *Breach of Trust.*

The plaintiffs argued in the trial court that it had jurisdiction under the Tucker Act because the United States, under the 1968 Act, held the appropriated funds in trust for the members of the "tribes, bands or groups," with a duty to pay the funds to them as provided in that Act. The trial court rejected this argument.

The Tucker Act, 28 U.S.C. § 1346(a)(2), gives district courts concurrent original jurisdiction over claims against the United States not exceeding $10,000 that are "founded either upon the Constitution, or any Act of Congress, . . . or upon any express or implied contract with the United States. . . ."

■ The Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States · for money damages." *United States v. Testan,* 1976, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114. A claimant must rely on some other independent, substantive right enforceable against the United States for money damages. *Rogers v. United States,* 9 Cir., 1983, 697 F.2d 886, 887, n. 2. If under the 1968 Distribution Act the judgment funds are deemed to be held in trust, a·substantive right exists, and the government's sovereign immunity is waived with respect to damage claims predicated on breach of that trust. *Id.* at 890; see *Moose v. United States,* 9 Cir., 1982, 674 F.2d 1277, 1281.

■ The trial court relied on *Whiskers v. United States,* 10 Cir., 1979, 600 F.2d 1332, in finding that the 1968 Distribution Act did not create the trust duties necessary for Tucker Act jurisdiction. Because of *Moose, supra,* and *Rogers, supra,* two cases that this court decided after the trial court's ruling, we disagree.

In *Moose,* we found Tucker Act jurisdiction of a claim by minor Indians that the government had violated a provision in a different Distribution Act, there applicable, that required it to "best protect" minor Indians' interests. 674 F.2d at 1281. We distinguished *Whiskers* as interpreting a different portion of the same Distribution Act, a portion that did not involve minors. *Id.* at 1282–1283. In broader language, however, we stated the general rule that "[e]xplicit use of the word 'trust,' or any other particular language, is not necessary" to manifest Congress' intent that the government hold a judgment fund for the benefit of the recipients. *Id.* at 1281. We continued,

This general rule applies with perhaps greater than usual force to a situation where the United States holds funds for an Indian tribe, because of the traditional and repeated emphasis on the fiduciary nature of the United States-Indian relationship. Indeed, where the United States holds funds for Indian tribes, a

trust relationship exists unless there is explicit language to the contrary.

*Id.* (footnote omitted). We quoted with approval the Court of Claims decision in *Navajo Tribe v. United States,* 1980, 624 F.2d 981, 987:

> [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Id.*

We relied on *Moose* in *Rogers* in holding that the Distribution of Judgment Funds Act, Pub.L. 93–134, 87 Stat. 466 (1973), 25 U.S.C. §§ 1401–1407, created the same sort of trust obligation upon which Tucker Act jurisdiction may be found. The Distribution of Judgment Funds Act was enacted in 1973 to establish a uniform procedure for distributing Indian judgment funds, *Moose,* 674 F.2d at 1282, and so is not directly applicable to the 1968 Distribution Act at issue in the case before us. But the purpose and effect of that Act, for this analysis, are identical with those of the 1968 Act specifying procedures for distributing the judgment in the case before us.

In *Rogers,* we recognized "that for a century and a half, the Supreme Court has characterized the relation of the United States to the Indian nations as a unique trust obligation." 697 F.2d at 890. We said that "strong tradition" demanded "a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust." *Id.*

We noted in *Rogers* that § 7 of the Distribution of Judgment Funds Act, 25 U.S.C. § 1407, indicates a "congressional belief that all funds appropriated to satisfy Indian judgments are held in trust." *Id.* That section provides that

> None of the funds distributed per capita or held in trust under the provisions of

this chapter shall be subject to Federal or State income taxes. . . .

The comparable section of the 1968 Distribution Act, at issue in this case, 25 U.S.C. § 662, states, in relevant part, simply that "[f]unds distributed under [the Act] shall not be subject to Federal or State income taxes." We do not think that Congress' failure to include the phrase "held in trust" in the tax provision of the 1968 Distribution Act is sufficient reason for us to decide that, contrary to the presumption identified above, the 1968 Distribution Act does not create a trust relationship. We have been able to find, and the parties have cited to us, no evidence of "explicit language" in the statute or its history indicating that the judgment fund moneys were not to be held in trust for the California Indians, pending distribution.

The trust fund was created by the 1964 Appropriation Act, *supra.* We have no doubt that the appropriated moneys were to be, and were, held in trust for the "tribes, bands, or groups," but the 1964 Act did not create a trust for the individual members. It did not purport to modify the limiting language of the Settlement Agreement which expressly denied them individual rights.

We conclude that all of the members, together, became, individually, trust beneficiaries under the 1968 Act, because that Act, for the first time, required that the appropriated moneys be paid to them individually, § 2, 25 U.S.C. § 660(a): "The Secretary shall distribute to each person whose name appears on the roll prepared pursuant to section 659 of this title [with certain exceptions], an equal share of the moneys which were appropriated" by the 1964 Appropriation Act.

The trial court had jurisdiction of this action under the Tucker Act, as an action for breach of a trust for the individual Indians.

### III. *The Merits.*

As we have seen, the trial court's certification referred to "jurisdiction ... on either a breach of trust or a breach of con-

tract theory." We have rejected the breach of contract theory, but have upheld the breach of trust theory. On the merits, however, the trial judge certified only the question "whether the United States breached the settlement contract." We have held that the breach of contract theory does not support jurisdiction because plaintiffs are not parties to the contract alleged to be breached. Ordinarily, we would remand for further proceedings, particularly for a determination of "whether the United States breached the trust created by the 1968 Act."

However, this matter has been pending for many years. It ought to be terminated if it properly can be. We therefore proceed to the merits, especially because our views as to the merits of the breach of trust claims are based on the same facts and theories that we would apply if we were dealing with breach of contract claims, and the questions are questions of law. *See United States v. McKinney,* 9 Cir., 1983, 707 F.2d 381, 383 and cases there cited.

The 1968 Distribution Act provides, in § 2, 25 U.S.C. § 660, for the payment, from the moneys appropriated in the 1964 Appropriation Act, to each individual Indian whose name appears on a roll to be prepared by the Secretary (with certain specified exceptions), of "an equal share of the moneys which were appropriated by" the 1964 Act, plus interest and less certain expenses.

The method of carrying out the trust for the individual Indians was established in §§ 1 and 5 of the 1968 Act, 25 U.S.C. §§ 659 and 663. Section 659 requires the Secretary to prepare a roll of the eligible Indians. Section 663 sets up a mechanism for preparing the roll. It reads, in pertinent part:

> The Secretary is authorized to prescribe rules and regulations to carry out the provisions of sections 659 to 663 of this title, *which rules and regulations shall include an appropriate deadline for the filing of applications for enrollment under section 659 of this title.* The determinations of the Secretary regarding eligibility for enrollment, [and] the affilia-

tion of an applicant's ancestors, . . . shall be final.

(emphasis added).

It should be noted that § 663 makes the inclusion of a deadline for filing of applications for enrollment mandatory. This provision is essential to the accomplishment of the distribution of the funds appropriated. Unless, at some time, the roll is closed, the amount to be distributed to each Indian cannot be known, and the moneys could never be distributed.

The Secretary acted promptly in enacting regulations under § 663. They were published in the Federal Register on November 1, 1968, 33 Fed.Reg. 16,086, and are Part 43e of 25 C.F.R. (1969). Section 43e.5(a) deals with filing of applications for enrollment, and requires that they be filed "within one (1) year after the date of the [1968] Act. Applications must be received no later than the close of business on September 22, 1969." *That deadline has never been revoked or extended by an amendment of the regulation or by its revocation or by the adoption of a superseding regulation.*

No claim is made by the appellees that the Secretary's efforts to publicize the requirements for applying for enrollment were insufficient. No claim is made that the time, one year from the enactment of the 1968 Act, is unreasonable, or too short. The deadline passed, and at the close of business on September 22, 1969, the Secretary ceased to be a trustee for an unknown number of Indians, some of them unknown. He became, instead, a trustee for a known number of known Indians, and he held a mathematically determinable amount of money for each, and it became his duty to complete the roll from the timely filed applications, to compute the amount to be paid to each enrollee, and to promptly pay it to each, and to no others.

The Secretary did none of those things. So far as appears, he did nothing for approximately a year, during which additional applications for enrollment were received, except to discontinue publicizing the matter. Then, in September and October of 1970, his deputy, the Commissioner of Indi-

an Affairs, sent memoranda to the Area Directors of the Bureau of Indian Affairs directing them to treat late filing of applications as a technical deficiency to be disregarded in preparation of the rolls and distribution of the funds. No official notice of these memoranda was given, they were not published in the Federal Register, and 25 C.F.R. § 43e.5(a) was not amended. Finally, on February 5, 1971, the Commissioner, by a similar memorandum, again not published in the Federal Register, revoked the September and October 1970 memoranda, and refused to accept applications filed after February 5, 1971. A roll was then prepared from all applications filed through February 5, 1971, the amount due each enrollee was computed, and the moneys were distributed on December 18, 1972.

We assume, for the purpose of this case, that the Secretary could have extended the September 22, 1969 deadline by a proper amendment of his regulation, adopted before September 22, 1969. We doubt, but do not decide, whether he could have done so after the September 22, 1969 deadline, because the passing of the deadline fixed the rights of those who had filed on time, and a later extension would adversely affect those rights.

We have no doubt, however, that the September and October, 1970 memoranda were not authorized by law, and that their issuance and the subsequent payment to Indians who filed after September 22, 1969 were illegal. The trial court held, and we agree, that 25 C.F.R. Part 43e, and particularly § 43e.5(a), were rules, as defined in the Administrative Procedure Act, 5 U.S.C. § 551(4), and that their adoption was rule making under § 551(5). The court also held that the September and October 1970 memoranda were also "rules," to which the requirements of rule making apply, and that they were adopted in violation of the Administrative Procedure Act. The court cited *Morton v. Ruiz,* 1974, 415 U.S. 199, 230–236, 94 S.Ct. 1055, 1072–75, 39 L.Ed.2d 270, and our decision in *Willapoint Oysters, Inc. v. Ewing,* 9 Cir., 1949, 174 F.2d 676, 686– 687. We agree. To be legally effective, those memoranda should have been currently published in the Federal Register, 5 U.S.C. § 552(a)(1)(D). Necessarily, the same result should be reached regarding the February 5, 1971 memorandum.

We think, however, that the trial court went astray in applying its conclusions to the plaintiffs' claims. The trial court took the position that to hold the September and October 1970 memoranda void would adversely affect the plaintiffs, and that for that reason the plaintiffs should prevail, citing *Rodway v. U.S. Dep't of Agriculture,* D.C.Cir., 1975, 514 F.2d 809, 817, and *United States ex rel. Parco v. Morris,* E.D.Pa., 1977, 426 F.Supp. 976. Those cases are not in point, however. None of the plaintiffs here failed to meet the September 22, 1969 deadline in reliance on the September or October 1970 memoranda. Nor did the February 5, 1971 memorandum cut off their rights. It was the failure to meet the September 22, 1969 deadline that cut off their right to benefit from the trust created by the 1968 Distribution Act. The September and October 1970 memoranda conferred no rights because by then, under the 1968 Act, the identities of the beneficiaries had been finally determined; therefore the February 5, 1971 memorandum deprived those applying after September 22, 1969 of no rights.

We conclude, contrary to the trial court's decision, that persons who filed applications after September 22, 1969, acquired no rights, and that the September and October memoranda gave them no rights. Thus, the Secretary should not have included on the rolls those who applied after September 22, 1969 and should not have paid a part of the appropriated funds to them.

However, none of the plaintiffs, either the named plaintiffs or the classes that they purport to represent, has been damaged by the actions of the Secretary. They have no right to receive any of the appropriated funds. The only persons who might have a claim against the United States are those persons who filed their applications before the close of business on September 22, 1969. To the extent that the Secretary included in the distribution persons who applied be-

tween September 22, 1969 and February 5, 1971, he was diminishing the share of each Indian who applied within the deadline. However, none of those Indians is a party to this action.

Reversed and remanded with instructions to dismiss the action.