Joyce **LOUDNER, Paul Harrison, Ambrose McBride, Chauncey Long Crow, Della Lytle, Hilda Long Crow, Lisa Redwing, Horace Gilbert Slow, Dorothy Slow, Darlene Fallis Jones, Lyle Medicine Crow, Ramona Estes, Fay Jandreau, Norman V. Taylor, Plaintiffs,**

v.

**UNITED STATES of America, and Bruce Babbit, individually and in his capacity as Secretary of the Interior, Defendants.**

Civ. No. 94–4294.

United States District Court,
D. South Dakota,
Southern Division.

Oct. 12, 1995.

Michael Charles Abourezk, Abourezk Law Offices, Rapid City, SD, Charles Rick Johnson, Stephanie E. Pochop, Johnson, Eklund Law Offices, Gregory, SD, for plaintiffs.

Craig Peyton Gaumer, U.S. Attorney's Office, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Before the Court is the United States' Motion to Dismiss, Docket Number 6, which came on for hearing on February 13, 1995. The Court took the motion under advisement and requested supplemental briefing and additional factual submissions on the issue of notice. Doc.21. The supplemental briefs were timely filed.

## BACKGROUND

In 1967, the Sisseton–Wahpeton Sioux Tribe, the Devils Lake Sioux Tribe, and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes reached a settlement with the Indian Claims Commission in which the Tribes received approximately $6,000,000.00 in compensation for lands along the Mississippi River taken by treaty.[1] *Sisseton and Wahpeton Bands or Tribes v. US,* 18 Ind.Cl.Comm'n 526–1 (1967). In 1968, Congress appropriated money to satisfy the judgment. Act of June 19, 1968 (82 Stat. 239). In 1972, Congress passed a plan which provided for the distribution of monies to the descendants of the aboriginal tribe. Act of October 25, 1972 (25 U.S.C. §§ 1300d–3 through 1300d–9).

The 1972 Distribution Act provided that 25.0225% of the appropriation[2] was to be divided among the lineal descendants of the original Sisseton–Wahpeton Tribe who were not members of the three successor tribes.[3] 25 U.S.C. § 1300d–4. The portion of the judgment designated for the Tribes has already been distributed and is not at issue here. The Secretary of the Interior was "authorized to prescribe rules and regulations to carry out the provisions of this chapter, including the establishment of deadlines." 25 U.S.C. § 1300d–9. The deadline for submitting applications to share in the distribution was November 1, 1973. 25 C.F.R. § 61.4(s)(2). The BIA processed the applications to determine eligibility beginning late in 1978 and finishing early in 1980.[4] Doc. 17 at 70.

In April, 1987, the roll had been completely updated and distribution was scheduled for May 7, 1987. Doc. 17 at 79. The final role contained 1969 names. *Sisseton–Wahpeton*

1. The two treaties involved were the Treaty of Prairie du Chien of July 15, 1830 (7 Stat. 328), in which the Sisseton–Wahpeton Sioux ceded approximately 2 million acres to the United States, and the Treaty of Traverse des Sioux of July 23, 1851 (10 Stat. 949) in which the Tribe ceded approximately 25 million acres to the United States.

2. As of August 31, 1994, the amount to be distributed to lineal descendants was $1,324,562.71 in principal and $10,420,728.90 in interest. Doc.1 at V.

3. In order to qualify for a per capita share of the distribution, a lineal descendant had to:

   (1) be born on or prior to October 25, 1972;
   (2) have a lineal descendant whose name appears on the membership rolls designated by the Secretary;
   (3) not be an enrolled member of any of the three Tribes with whom the settlement was reached; and
   (4) be a United States citizen.
   25 U.S.C. §§ 1300d–3(a), 1300d–5; 25 C.F.R. § 61.4(s)(1) (1994) (originally published at 25 C.F.R. § 41.3(s) (1973)).

4. BIA Tribal Enrollment Specialist Karen A. Joseph testified that the five-year delay in evaluating the applications was the result of their office handling some 24,000 applications for the Pembina judgment award. Doc.17 at 70. The Bureau received more than 11,000 applications for the award to the Sisseton–Wahpeton lineal descendants. *Id.* at 77.

*Sioux Tribe v. US,* No. CV–87–095–GF, slip op. at 4 (D.Mont. Sept. 20, 1994). Distribution was enjoined by the filing of the first of several lawsuits seeking to avoid any distribution to lineal descendants. The three Tribes first brought suit in Federal District Court in Montana challenging the validity of the Distribution Act itself. *Sisseton–Wahpeton Sioux Tribe v. US,* 686 F.Supp. 831 (D.Mont.1988). The district court did not reach the merits of the claim, holding the case barred by the statute of limitation in 28 U.S.C. § 2401(a). *Id.* at 838. The Ninth Circuit upheld the decision in *Sisseton–Wahpeton Sioux Tribe v. US,* 895 F.2d 588 (9th Cir.1990).

The tribes then filed suit alleging that the number of lineal descendants was exceptionally small, thereby making an allocation of 25% of the fund to them irrational. *Sisseton–Wahpeton,* No. CV–87–095–GF, slip op. at 3. The tribes argued that only those lineal descendants of persons listed on the aboriginal tribal roles from 1830 or 1851, the dates of the treaties, or 1862, just prior to forced dispersal, could qualify under 25 U.S.C. § 1300d–3(b). *Id.* at 6. The court granted summary judgment to the government, holding the statute was written in the disjunctive ("or") and included, in addition to the original tribal members, anyone listed on the rolls acceptable to the Secretary of the Interior on November 1, 1973. *Id.* at 7. The appeal of that decision is currently pending.

The present lawsuit was brought by a group of lineal descendants of the Sisseton–Wahpeton Sioux who are not listed on the roll prepared pursuant to 25 U.S.C. § 1300d–3(b). Plaintiffs allege that they have been deprived of valuable property rights by the Secretary of the Interior's failure to provide adequate notice to potential claimants of the lineal descendants' share of the Mississippi–Sioux judgment. Doc. 1 at XI–XVIII.

**MOTION TO DISMISS**

Government brings its Motion to Dismiss for Lack of Jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1). Doc.6. The government argues that this suit is time-barred by the statute of limitations, 28 U.S.C. § 2401(a). *Id.* at 2.

Subject matter jurisdiction is a threshold issue. *Kronholm v. FDIC,* 915 F.2d 1171, 1174 (8th Cir.1990). It goes to the very power of the Court to entertain the case. Plaintiffs bring this suit pursuant to 28 U.S.C. § 1346(a)(2), the Tucker Act, which is a waiver of sovereign immunity for claims for damages against the United States. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Any waiver of sovereign immunity is narrowly construed and "terms of [the] waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). The courts are "not free to enlarge that consent to be sued." *Mann v. United States,* 399 F.2d 672, 673 (9th Cir.1868).

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action whenever the court lacks jurisdiction over the subject matter. The Eighth Circuit has stated the standards applicable to motions to dismiss:

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Osborn v. United States,* 918 F.2d 724, 730 (8th Cir.1990); *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993).

Plaintiffs claim, brought under 28 U.S.C. § 1346(a)(2), alleges a due process violation resulting from insufficient notice of the requirements for eligibility in the Mississippi–Sioux distribution. A colorable constitutional claim must be brought within the six-year statute of limitations for civil actions against the United States. 28 U.S.C. § 2401(a); *Impro Products, Inc. v. Block,* 722 F.2d 845, 851 n. 12 (D.C.Cir.1983). The

parties agree that § 2401(a) applies to this claim. Doc.7 at 2–3; Doc. 18 at 9.

■ Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." An action first "accrues" when a plaintiff knows or reasonably should have known of his injury. *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979); *Sisseton–Wahpeton*, 895 F.2d at 592. "When a particular claim 'accrues' ... is a question of federal law which must be determined by the court in light of the surrounding circumstances." *United States v. LePatourel*, 593 F.2d 827, 830 (8th Cir.1979). If the Court determines that the notice given of the 1972 Distribution was adequate to inform these plaintiffs of their rights to participate in the distribution, their cause of action is time-barred.

■ The Court finds that Plaintiffs' cause of action accrued in 1972 when the Distribution Act was passed. The Court finds the language of the 1972 Distribution Act and the reasoning of the District Court in Montana persuasive:

> It was the 1972 Distribution Act, which first provided, in section[s] 202(a) and (c), 25 U.S.C. §§ 1300d–4(a) and (c), for a per capita distribution to individual Indians. Accordingly, on October 25, 1972, the date the Distribution Act was enacted, a designated portion of the judgment fund became, for the first time, a fund held for the benefit of, and payable to, the individual lineal descendants.... [A]ny claim emanating from the decision of Congress to distribute a portion of the judgment fund appropriated by the 1968 Appropriations

Act to individual lineal descendants accrued on October 25, 1972[.]

*Sisseton–Wahpeton*, 686 F.Supp. at 836–37. Although the Ninth Circuit, in affirming the District Court, suggested that the fact that a designated portion of the fund only became vested in individual payees in 1987, "might affect the time of accrual of the lineal descendants' cause of action," *Sisseton–Wahpeton*, 895 F.2d at 595, that statement is dicta and not helpful to Plaintiffs.[5] A cause of action accruing in 1987 would have been time-barred in 1993, and this suit was not filed until December 23, 1994.[6]

■ Notice which is constitutionally sufficient must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). As *Mullane* states:

> The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.... [If] these conditions are reasonably met, the constitutional requirements are satisfied.

*Id.* at 314–15, 70 S.Ct. at 657. Whether the notice to the Sisseton–Wahpeton lineal descendants was sufficient requires a balancing of three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and ad-

---

5. Plaintiffs argue that the claims of the lineal descendants did not accrue in 1972, when the claims of the Tribes accrued. *Sisseton–Wahpeton*, 686 F.Supp. at 836. They argue that the roll of eligible lineal descendants is not yet "final" in 1995, referring the Court to Ms. Joseph's testimony. Doc. 17 at 122–23. Ms. Joseph's testimony is not conclusive. Taking the statement in context, it is clear that the Secretary has not approved the "final" role because the 1987 payment roll must be brought current before distribution can be made. *Id.* at 84. If Plaintiffs' claim does not accrue until the Secretary actual-

ly issues his determination of eligibility at some point in the future, Plaintiffs would have no standing at this time to bring this suit nor would this suit be ripe for adjudication.

6. There was no showing of notice given in 1987 of who was determined to be eligible as a lineal descendant. Accordingly, if that were a time from which the statute of limitations could otherwise run, it would not in this case be due to lack of notice to aggrieved parties. For the reasons stated elsewhere, 1972 and not 1987 is the time from which the statute commenced to run.

ministrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ The focus in this case is on the fairness of the procedures used and the cost of additional procedures. Plaintiffs urge the Court to find that actual notice to lineal descendants was required because those descendants were readily ascertainable, citing *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), and *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). The potential claimants in the instant case were not known nor were they reasonably ascertainable. In addition, reasonably diligent efforts would not have identified the numerous potential claimants who are widely dispersed. The termination of the lineal descendants' claims without actual notice did not violate due process.

The Court finds both cases instructive but distinguishable. *Tulsa Collection Services* dealt with notification by publication to creditors of probate proceedings. 485 U.S. at 482, 108 S.Ct. at 1343. The Supreme Court held, "On balance then, a requirement of actual notice to known or reasonably ascertainable creditors is not so cumbersome as to unduly hinder the dispatch with which probate proceedings are conducted." *Id.* at 490, 108 S.Ct. at 1357. The Supreme Court went on to specifically exempt the actual notice requirement for those creditors who were not "reasonably ascertainable" and "those with mere 'conjectural' claims." *Id.* Similarly, *Mennonite Board* held that notice by publication to a single mortgagee of a pending tax sale was not sufficient when the mortgagee was listed in the county records. 462 U.S. at 798 n. 4, 103 S.Ct. at 2711 n. 4. The Supreme Court reasoned that, although no address was listed for the mortgagee, the address could have been ascertained through "reasonably diligent efforts." *Id.* The court then stated, "We do not suggest, however, that a government body is required to under-

take extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record." *Id.*

I find the requirement of actual notice unduly burdensome in this case. The fact patterns in *Tulsa Collection Services* and *Mennonite Board* each concerned a single creditor. The number of potential creditors or mortgagees considered in probate or collection actions come nowhere near the numbers of actual claimants to the Mississippi-Sioux Distribution. The notice that was given, adequate or not, yielded over 11,000 applications. Plaintiffs argue that the fact that the BIA *verified* the applications proves that the BIA could have developed a list of lineal descendants of those persons on the McLaughlin roll from which personal notification could have been given. *Id.* at 8. Plaintiffs' suggestion is that reverse genealogical searches could have been performed in order to find descendants of those listed on the four McLaughlin rolls.[7] While this would be an ideal method of giving notice to those who might claim to be lineal descendants, it would also require a tremendous and unreasonable commitment of time and resources. In addition, actual notice could only be a supplement to published notice as there are many potential claimants that this Court concludes would not be located through the search methods suggested for determining identities and addresses for giving actual notice. It appears that it took the BIA almost two years to confirm through genealogical searches that 1969 of the 11,000 applicants were, indeed, lineal descendants. Doc. 17 at 70. Plaintiffs also argue that the BIA could have used allotment, probate and lease payment records as a basis for personal notice. Doc. 18 at 6–8. Whether this method of notice would be any more successful than the method used is doubtful. For example, allotment records would trace the ownership of those tribal lands distributed to tribal members under the General Allotment Act of 1887 (Dawes Act), codified as amended

---

7. Ms. Joseph testified that there are four McLaughlin rolls: the 1917 roll which was completed in 1923 listing Santee descendants, a roll for the Devils Lake Tribe, a roll for the Sisseton-Wahpeton Tribe, and a miscellaneous roll. There are over 2000 names on the Santee roll. Doc. 17 at 105.

at 25 U.S.C. § 331 *et seq.* The lineal descendants participating in the distribution cannot be members of the three successor Tribes, and may not be members of any other tribe. It is likely that at least some number of the lineal descendants never received allotments due to the fact that they were not enrolled with any tribe. Allotment records would, therefore, be useless in locating those persons. Finally, the Court must consider the time and expense required to execute these suggestions. Testimony reflected cuts in staffing in the BIA,[8] a trend most likely to continue. The Aberdeen office of the BIA could even be eliminated along with other substantial reductions in BIA funding and personnel.

Evidence produced of actual notice given to potential claimants is limited to notice in the Federal Register,[9] news releases published by the Department of the Interior [10] and the Aberdeen BIA Office,[11] and notices sent to Indian newspapers, centers and organizations, Doc.17 at 64. The parties have located four newspaper articles that were actually published. Articles appeared in the *Rapid City Journal* on June 2, 1973, and on October 30, 1973; in the *Sisseton Courier* on October 25, 1973; and in the *Navajo Times* on April 5, 1973. Doc.22; Doc.23.

Plaintiffs argue that there were a number of deficiencies in the wording and timing of the articles published. Doc.25 at 2–5. In particular, Plaintiffs allege that the articles would have been more effective had the amount of money available been stated. I find that Plaintiffs' complaints are unfounded. The articles accurately convey the information that there is a fund which is available to lineal descendants of the Sisseton–Wahpeton Tribe, and direct interested parties to the BIA office in Aberdeen, South Dakota. The most substantive of Plaintiffs' complaints is that the October articles were published too close to the deadline for application to be effective notice. However, one of the articles was at least the second notification to appear in the *Rapid City Journal,* and the other clearly states in the headline, "Applications Due Soon For Sioux Judgment Fund" and, in the body, "Applications ... must be in the Aberdeen area office ... by Thursday." Doc.22 at Ex.3. The articles published and notice otherwise given was, when taken in its entirety, constitutionally sufficient.

Although more articles may have appeared than we have evidence of,[12] this decision must

---

8. Ms. Joseph testified that there are presently two employees in the enrollment division. Doc. 17 at 104. When the applications were first evaluated, roughly a two-year process, the office had six employees. *Id.* at 71.

9. 38 Fed.Reg. 13737, Hearing Ex.6 at 3. The government relies heavily on its argument that publication in the Federal Register constitutes sufficient notice in and of itself, citing 44 U.S.C. § 1507; *Shiny Rock Mining Corp. v. United States,* 906 F.2d 1362 (9th Cir.1990); *Friends of Sierra R.R. Inc. v. ICC,* 881 F.2d 663 (9th Cir. 1989), *cert. denied sub nom Tuolumne Park & Recreation Dist. v. ICC,* 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1069 (1990), and *Government of Guam v. United States,* 744 F.2d 699 (9th Cir.1984).

It is well-established that publication of rules and regulations in the Federal Register operates as constructive notice to all those affected by them. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947); *Ed Taylor Construction Co. v. OSHA Review Comm'n,* 938 F.2d 1265, 1272 (11th Cir. 1991) (citing *North Ala. Express, Inc. v. United States,* 585 F.2d 783, 787 n. 2 (5th Cir.1978)). I find that administrative rules and regulations differ in essence from the application procedure at issue here. Although the distribution of judg-

---

ment funds is an administrative process, these distributions are singular events and some additional means of notification is required.

10. Ms. Joseph located two news releases issued by the Department of the Interior in the BIA files dated May 24, 1973, Hearing Ex.6, and March 28, 1973, Hearing Ex.7.

11. The press releases issued from the Aberdeen BIA Office are dated June 26, 1973, Hearing Ex. 4, and October 15, 1973, Hearing Ex.3.

12. In other cases which the Court examined, there was evidence of greater dissemination of the information. For example, in *Rogers v. United States,* the BIA sent "letters to ... newspapers, television stations, and radio stations ... enclosing a public service announcement ... Letters were also sent to 97 different organized Indian groups in 24 states and the District of Columbia." 877 F.2d 1550, 1553–54 (9th Cir. 1989). The evidence in *Rogers* was fresher, the suit having been first brought in the early 1980's. *Rogers v. United States,* 697 F.2d 886 (9th Cir. 1983). In *Angle v. United States,* the court comments that "it is undisputed that, before the deadline, the government vigorously sought to notify potential claimants that they could apply."

be based upon the record in the present case. The parties searched for articles appearing between April 1 and November 1, 1973, in newspapers having microfilm records.[13] Karen A. Joseph, a tribal enrollment specialist, testified that she was unable to locate a copy of the publication that was used at the time of notification which listed newspapers, organizations and centers that would have received notices. Doc. 17 at 64. She remembers seeing a 12–page listing of Indian organizations which included a newspaper for the Standing Rock Tribe, "Akwesasne Notes," and the Los Angeles Indian Center. *Id.* at 65–66. She believes that notice was mailed to those organizations, but she was not the person who mailed the notices. *Id.* at 69. It is unlikely that small, local papers kept microfilm records. Furthermore, there is no way to demonstrate twenty-two years after the fact that notices sent to Indian agencies and centers were or were not posted. Some of the best evidence presented to the Court that notices were posted or published is the fact that over 11,000 persons filed applications to participate in the distribution. Notice was obviously effective as to those persons.

■ Statutes of limitations "are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). This appears to be the quintessential statute of limitations challenge—much of the

evidence necessary to prove or disprove the adequacy of notice is gone after twenty-two years. The Court notes the limited evidentiary submissions and Ms. Joseph's testimony that the BIA is not required to keep documents more than five (5) years. Doc. 17 at 94. In sum, much of the evidence that the government needs to defend against this suit has possibly been destroyed or lost over time.

■ Because neither party can prove in its entirety what notice was actually given, the Court must examine the procedures for notification outlined in the 1972 Distribution Act itself.[14] Plaintiffs cite the Administrative Procedures Act [APA], 5 U.S.C. § 702, as authority for judicial review of the Secretary's determination regarding eligibility. The APA provides for judicial review of "final agency action[s] for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. The 1972 Distribution Act provides no method of administrative appeal. Consequently, I find that Plaintiffs have no adequate remedy other than judicial review.

■ The standard of review to be applied depends upon the amount of discretion given to an agency and the type of rulemaking involved. 5 U.S.C. § 706. The more discretion an agency has, the less judicial review is permitted. Looking at the 1972 Distribution Act at issue here, it appears that the Secretary was given almost no discretion in formulating a distribution procedure. The language of the 1972 Distribution Act does

---

709 F.2d 570, 571–72 (9th Cir.1983). Here again, that interlocutory appeal was much closer in time to the actual events. *Id.*

**13.** The microfilm records of the *Sioux Falls Argus Leader,* the *Rapid City Journal,* the *Todd County Tribune,* the *Chamberlain Register,* and the *Navajo Times* were searched. Doc.23.

**14.** Plaintiffs argue that notice was inadequate because the government did not follow the mandates of the Distribution of Judgment Funds Act, 25 U.S.C. §§ 1401–1407. Whether the DJFA applies to the Mississippi–Sioux Distribution is a question of law. *Dept. of Social Services v. Bowen,* 804 F.2d 1035, 1037 (8th Cir.1986). The DJFA was passed on October 19, 1973, and the express language of the Act makes it applicable

to "judgments for which funds have been appropriated and *for which legislation authorizing use or distribution has not been enacted....*" 25 U.S.C. § 1402(a) (emphasis added). Sections 1300d–3 through 1300d–9 of Title 25, United States Code, specifically deal with the distribution of funds appropriated for the Upper Council Sioux of the Mississippi Sioux Tribes and were passed October 25, 1972. Finally, a Federal District Court in Washington has held that the DJFA has only prospective application. *U.S. v. State of Washington,* 384 F.Supp. 312, 400–01 (W.D.Wash.1974), *aff'd and remanded,* 520 F.2d 676 (9th Cir.), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1975). The Distribution of Judgment Funds Act is not applicable to this distribution.

not require formal rulemaking,[15] formal rulemaking being indicated by a requirement for a hearing "on the record". 5 U.S.C. § 554(a). Any rules promulgated are, therefore, subject to an arbitrary and capricious standard of review.[16]

■ The regulations published at 25 C.F.R. § 41.3(s) follow the mandate of the 1972 Distribution Act exactly. The only item left to the Secretary's discretion is the deadline for applications which was determined to be November 1, 1973. The regulations were published in the Federal Register on May 25, 1973, and provided five months during which application to participate in the distribution could be made. 38 Fed.Reg. 13737 (May 25, 1973). In *Angle v. United States*, a case dealing with a distribution to relatives of Indians who lived in California on June 1, 1852, the Secretary published regulations governing applications in the Federal Register on November 1, 1968. 709 F.2d 570, 576 (9th Cir.1983). Those regulations set the application deadline as September 22, 1969—eleven months later. *Id. Rogers v. United States* concerned a distribution to the Northern Paiute Indian Nation. 877 F.2d 1550, 1553 (Fed.Cir.1989). The regulations governing that distribution were published in the Federal Register on April 16, 1975, the regulation was made effective immediately, and the application period terminated 180 days later on October 13, 1975. *Id.* The Court can locate no other cases which might provide guidance as to how long the public was given to make similar applications. A notification period of five months is not a generous period of time for notice under the rather difficult facts of this case where potential claimants were not tribal members but were to be lineal descendants of tribal members. Establishment of that notification period is not, however, an arbitrary or capricious determination in this case.

■ Considering the *Mathews* factors to determine if the notice to lineal descendants was sufficient, those Plaintiffs that are lineal descendants have a strong interest in receiving a share of the judgment distribution from the sale of ancestral lands. The 1969 persons who timely filed their claims and were determined by genealogical research to have valid claims have been waiting for their distribution since 1987. Those persons have a private interest in the notice they complied with being found adequate so they can receive their distribution. As to the second consideration, there was a risk of an erroneous deprivation of claimant's interest through the procedures used. It is difficult to know how many more claimants there would finally be, let alone how many of those persons would ultimately be determined by genealogical research to also be entitled to an award. Some additional claimants would be reached by the use of the supplemental methods of notice urged by Plaintiffs. The benefit or probable value from attempting actual notice or other supplemental notice is real but limited. Given the universe of potential claimants, it seems that whatever methods are used there will continue to be a limited number of people who will not receive notice.

15. *Angle* characterizes the Secretary's rulemaking under the 1968 Distribution Act as informal. 709 F.2d at 577. In *Angle,* the Secretary extended the application deadline without publication in the Federal Register. The Ninth Circuit held that the extension failed for lack of sufficient notice. *Id.*

16. Under "arbitrary and capricious review," an agency's actions will be set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review looks at four things:

(1) Has the agency relied on factors Congress has not intended it to consider?
(2) Has the agency entirely failed to consider an important aspect of the problem?
(3) Is the agency's offered explanation for its decision one that runs counter to the evidence before the agency?
(4) Is the agency's decision one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise? (That is, was there a rational connection between the facts found and the choice made.)

Childress & Davis, *Federal Standards of Review,* § 15.07 at 15–41 (2d ed. 1992) (citing *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). Restated, the test is: (1) whether the agency considered what it was supposed to consider; (2) whether the agency considered something it was not supposed to consider; and (3) whether there is a rational relationship between the evidence and the decision.

Failure of some to receive notice is not to be condoned on such an important issue, but the desire to give notice to everyone must be balanced with other considerations. Finally, with regard to the Government's interest, the Government has an interest in finally paying these funds to claimants who were identified in 1987. Payment would also stop the accrual of interest. The cost and the delay of ascertaining potential claimants and attempting to give actual notice would have been and still is prohibitive in view of the few additional qualified claimants that the Court believes would have been, or would now be, located.

I find that notice in the form of press releases and newspaper articles coupled with CFR publication was constitutionally sufficient in this distribution case due to the large number of potential claimants. Actual notice was not practicable nor was it required. As for reliability, the passage of twenty-two years makes it difficult to determine in total what notice was actually given. Evidence has been destroyed or lost, witnesses with first-hand knowledge of the notification process are not available. The reliability of the procedures is evidenced, on one hand, by the fact that these Plaintiffs apparently did not receive notice, and, on the other hand, by the fact that more than 11,000 other persons did receive notice and filed a claim. It would be speculation to wonder how many persons received notice and did not act upon the notice at the time or received notice and determined they were not eligible.

A different supplemental safeguard, a new period of notification, would require much duplication of effort in the evaluation of a new set of applications, and increased interest on the judgment from the further delay in distribution. The interested public must also have some faith in the fact that a governmental distribution such as this one will end rather than continuing on for generations. The probable value of renotification does not outweigh the cost. Despite that fact, if the notice given was constitutionally deficient, then renotification would be necessary. The notice given apparently was not all that it could have been, but it was adequate. Accordingly,

IT IS ORDERED: that Defendant's Motion to Dismiss, Doc. 6, is granted as claimants are barred by the statute of limitations and judgment is entered for Defendant and against Plaintiffs.

## JUDGMENT

In accordance with the Court's Memorandum Opinion and Order filed this date with the Clerk, Defendants' Motion to Dismiss is granted, and

IT IS HEREBY ORDERED that judgment shall be entered for Defendants and against Plaintiffs, with prejudice.